**Doris BURKEY, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 90–3965L.

United States Claims Court.

March 19, 1992.

James S. Casebolt, Grand Junction, Colo., for plaintiff.

Gerald S. Fish, with whom was Caroline M. Zander, Washington, D.C., for defendant.

### OPINION

BRUGGINK, Judge.

This is an action brought pursuant to the Fifth Amendment to the United States Constitution. The plaintiff, Mrs. Doris Burkey, contends that actions of the Bureau of Reclamation ("Bureau") connected with the construction of Ridgeway Dam, in Ouray County, Colorado, resulted in a taking of the value of minerals held under a mineral reservation clause. After trial, and for the reasons expressed herein, the court concludes that Mrs. Burkey is not entitled to compensation.

### FACTS

a. The ranch

The property in question, now inundated, consists of 300 acres of what was once ranch land in the valley of the Uncompahgre River. The river flowed through the property and the bed of the stream was owned as part of the entire tract. The stream bed consisted largely of sand and gravel. Sand and gravel were also visible in the banks of the terraces above the

stream bed, and were evident upon any excavation.

The property at issue was purchased in 1949 by Doris and Oliver Flury. They farmed it and raised cattle. When the Flurys sold the property in 1951 to the Shepardsons, they retained a ½ interest in "oil, gas, and minerals lying in, on or under said premises ..., together with the right to enter upon, explore, prospect, mine and drill for ... and remove the same ..., provided, however, that [the surface owners] shall be held harmless for any and all damage to the premises on account thereof." Mrs. Flury testified that she knew there was sand and gravel on the property, and that it was her expectation that the retained mineral interest encompassed the sand and gravel. In the time the Flurys held the half interest in all the minerals, they did nothing to exploit any minerals on the property.

In 1955 the Burkeys purchased the ranch from the Shepardsons. The Shepardsons also retained a one half interest in the mineral estate that they conveyed (at that time only one half). The Burkeys thus acquired the entire legal estate, subject to the ½ mineral interest still then retained by the Flurys, and the quarter interest in minerals retained by the Shepardsons. Although the ranch had a house on it, the Burkeys lived in Grand Junction, which is 88 miles from the ranch site. John Burkey's primary occupation was operation of a lumber business in Grand Junction, but he apparently had a number of varied business interests and responsibilities. He was characterized as an astute businessman. The Burkeys hired a foreman, Lloyd Berryman, to operate the ranch. The home on the property was improved, and Berryman and his family lived on the ranch from 1955 until 1977.

Warren Gibbs, a local real estate agent, testified concerning the Ridgeway area in general and the parcel in particular. He has lived in Ouray County since 1937. He stated that the year he arrived a gravel pit

was developed at the site, the rock crushed, and then used to top a local road. The pit was abandoned and became a pond. He also testified that it was not uncommon in the past for anyone needing small quantities of gravel for specific projects to remove them from the river bed at any suitable place in the valley. The deposits would be replenished during spring floods. More recently, however, state, local and federal environmental and land use regulations have virtually eliminated excavation of gravel from the river bed. Some limited pit mining occurs in the vicinity of Ridgeway, but even this is becoming more problematic because of regulatory restrictions.

Because of the nature of the alluvial soils, the Uncompahgre River Valley has been extensively explored for placer gold.[1] Although small placer gold mining operations were present along the river during the period 1930–1939, all were marginal enterprises. Plaintiff's son, Brooke Burkey, testified that several years ago, someone approached his father about working the sand and gravel on the property for placer gold. The material removed was to be replaced by fill dirt. That was not pursued, however.

b. The dam

By the 1960's it was common knowledge in Ouray County that the Bureau of Reclamation had an interest in damming the river and impounding a lake near Ridgeway. Because of its original intended site, this project was referred to as the Dallas Creek Project. In 1968 Congress authorized construction under Public Law 90–537. By 1972 it would have been common knowledge that the probable site of the dam itself would be immediately downstream of the Burkey property. The Burkeys knew or should have known that, if the dam were built, their land would largely be flooded.

The dam was to be built almost exclusively of earth fill materials, as opposed to concrete. In 1972, prior to acquiring the

---

1. Placer gold does not run in veins. Rather, it exists in alluvial deposits of gold flakes, washed into the valley from surrounding hills.

necessary land, the Bureau did a feasibility study of the site of the future reservoir to locate suitable materials for dam construction. The dam required approximately 12 million cubic yards of earth and rock fill material. The Bureau geologist responsible for this examination was Joe Barnes, who testified at trial. His report is dated September 1972. Barnes and his crew bored dozens of auger holes throughout the area, and evaluated the soils encountered. Three were dug on the Burkey ranch. Because the parties' characterizations of the materials ultimately taken off the Burkey property are important, the report is quoted here:

> The materials investigations were concentrated in the proposed reservoir basin where basically two types of soil are available. The two types are fine-grained soils containing small amounts of cobbles and boulders and gravelly soils containing large numbers of cobbles and boulders. Fine-grained soils are not abundant and have been deposited as slope wash, alluvial fans, and stream deposited materials.... The alluvium in the proposed reservoir is mostly gravelly material deposited by streams as outwash and fairly large areas are found....

> Borrow Area 500—Pervious Materials

> Two terraces of glacial outwash form this area; about 5,660,000 cubic yards has been outlined with three bucket auger holes. The material varies from silty to clayey gravel containing a high percentage of cobbles and boulders....

> Riprap or rockfill

> The gravelly soils proposed as borrow areas for previous material contain high percentages of cobbles or boulder ... These cobbles and boulders are of hard rock types such as andesite, rhyolite, volcanic tuff, and quartzite and are subangular to subrounded.

The report identified five borrow areas within the reservoir zone. The Burkey property made up approximately ⅔ of Borrow Area 500.

Barnes testified that prior to boring the test holes, he went to the Burkey property to ask permission to come onto the ranch with the auger equipment. He encountered Lloyd Berryman, who told Barnes that he could not give permission, that he would have to check, presumably with John Burkey. A couple of days later, Berryman called Barnes back and gave him permission. Barnes and his crew were on the Burkey property for two or three days. Their work would have been readily apparent to anyone on the property, although the holes were filled after the soil was analyzed.

Barnes testified that he told Berryman that the reason for the testing was to look for fill material. Berryman, for his part, testified that he did not recall Barnes' visit. He did recall the presence of auger holes, but recalled them as being post-purchase. The court does not view this as a conflict in testimony. The evidence that these three auger holes were pre-purchase is conclusive. Berryman did testify that he assumed the Bureau's purpose was to look for gravel. He also testified that he would not make a decision on his own about permitting exploration for materials. He would have consulted John Burkey.

The evidence is overwhelming that John Burkey knew about and permitted Barnes' activities on behalf of the Bureau, and specifically knew that the purpose of the auger holes was to test the suitability of the property as a source for fill material. There is no question that at least three of the larger bucket auger holes were drilled in 1972. The court believed Mr. Barnes when he testified that he obtained permission from Berryman prior to the drilling, and that he told Berryman generally of the purpose of the exploration. Barnes stated that he would not have brought the bucket auger onto the property without permission. It was the policy of the Bureau always to get permission in such circumstances. Given Barnes' testimony, the Bureau policy, the relationship between Berryman and Burkey, and Burkey's understandable proprietary interest in activities at the ranch, the court infers that Burkey

was aware of the auger holes, and their purpose.

In addition to the inventory of construction materials, there were two surveys completed of "mineral resources" at the Ridgeway Reservoir site. The first was completed in March 1963, by Maynard Ayler. The second by Earl Brauch in November 1972. Both men were employees of the Bureau of Mines, which did the work at the behest of the Bureau of Reclamation. The purpose of these surveys was not to locate construction materials, but to determine what mineral materials would be impaired by the presence of the lake and dam. In both reports, gravel and sand deposits are treated as "mineral resources," and referred to as part of the areas's "mineral potential."

In 1974, Barnes was referred a call from John Burkey. The latter had heard about the mineral study done by the Bureau of Mines in 1972, and was interested in the discussion in it about placer gold. He was aware of auger pit number 501 on the Burkey ranch, and wanted the data from that pit. Barnes wrote a note to the file which reflects that "Mr. John Burkey called Enos this date and wanted to know about the results of the gold sampling on the sand samples from his property." He sent Burkey a copy of the entire report.

The Burkeys made an effort to sell their ranch beginning in 1975. It was listed with Jack Berry, a real estate agent. Mr. Berry testified at trial. The authorization agreement, dated July 15, 1975, reflects that the property was "a cattle ranch that will accommodate over 100 head." The asking price was $580,000. Mr. Berry was to get a ten percent commission. The information to be disseminated through the multiple listing service showed that there existed at that time "plans for a dam that would put a large part of this ranch under water. It may never be built but the plans do exist." The published description also referred to the presence of sand and gravel deposits along the river.

Berry testified that he did not recall having any particular conversation about mineral rights with John Burkey, but he as-sumes that he would have told Burkey to keep them. The part of the listing information that was circulated to the public reflected, however, that the Burkeys were selling a "half" interest in minerals. The court concludes from this document, as well as Berry's general bias toward advising retention of mineral rights, that the Burkeys were hoping to sell half of their quarter interest, or a one eighth interest. Berry said he had some inquiries but no serious offers, and ultimately failed to sell the ranch.

c. The sale to the Bureau

By 1976, the Bureau began to acquire land for the lake. The process began with appraisals on the land to be purchased. Apparently two individuals did all the appraisals for the project. One, Foster Lamb, was a Bureau employee. The other, William B. Love, was hired on a contract basis. The hope was that all the land could be acquired through negotiated purchase, without resort to condemnation.

Lamb was assigned the task of appraising the Burkey land. His instructions were to appraise everything other than the reserved mineral estate. The Government did not want to pay for the latter. This instruction was based on a Bureau policy of only buying mineral rights when their extraction could never be permitted because of potential interference with the integrity of the dam itself. Thus, the mineral interests were only obtained with respect to lands under and immediately adjacent to the dam. There was testimony, and the court is persuaded, that with respect to the Burkey property, which was about two miles from the dam, the Bureau would have allowed development of resources such as oil and gas, or deep-mined gold deposits or uranium deposits, so long as the shafts or borings would not jeopardize the integrity of the reservoir.

Foster Lamb's appraisal of the Burkey property was completed on August 25, 1976. He went onto the property on several occasions, and discussed the appraisal preparation with John Burkey. He told Burkey that the site was needed for the

"construction, operation, and maintenance of the dam." Lamb testified that he and Mr. Burkey looked at a map of the proposed reservoir that showed a borrow area covering the entire site of the ranch. There was no specific discussion about how deep the borrow pit would be. Lamb stated that he had a clear memory of this conversation.

Lamb used the market data approach to value the ranch. He found its best use to be "speculation investment with an agricultural interim contribution use." He obtained comparable sales data with respect to similar properties in the area and concluded that the fair market value as of August 1976 was $492,000. In his general description of the property, Lamb broke data out into various categories, including "Soils," and "Mineral Resources." Under the latter caption, he recites that "Sand and gravel deposits occur along the river."

At the time he was doing his appraisal, the ranch was posted with a "For Sale" sign, so Lamb contacted Jack Berry. Berry told him that the $580,000 price covered "all" the Burkeys' interests. Lamb decided not to use the asking price in figuring his appraisal, however, since there had been no sale, and because it included a ten percent commission.

Equipped with the appraisal, Oral Birch, then in charge of the district office for land acquisition, began negotiating with John Burkey. They met three times. At no time did the two men discuss what was meant by the mineral reservation. There was, however, general discussion about the Government's interest in use of the property to obtain construction materials for the dam.

At the second visit, Birch presented a draft sales contract, and proposed a price of $492,000. Burkey rejected that price, saying he thought the property was worth more. At a subsequent visit, Burkey countered with $522,000. Birch eventually got approval for that price, less $8,200 as salvage value for the buildings, which Burkey was allowed to remove. The net price was thus $513,800. The contract was executed, and a deed prepared by the Bureau. The deed reserved to the Burkeys "all gas, oil, and minerals in all of the above-described land, together with the right to prospect and remove the same." This reservation was in turn subject to the following condition: "[A]ny rights reserved hereunder shall be exercised in such a manner as will not interfere with the construction, operation and maintenance of any works of the Dallas Creek Project. It is agreed that any exploration or exploitation of such gas, oil and minerals shall be approved by the Secretary of the Interior...." At the time the contract and the deed were negotiated and executed, there was no discussion about the meaning of the term "minerals" in the reservation clause. The employees of the Bureau who drafted the reservation had no specific understanding of the term "minerals."

The court finds that John Burkey knew that the Bureau wanted to acquire the site, not just because it would be inundated, but also to use as a borrow site. There is little alternative, given Birch's testimony, and the fact that Lamb showed him a map designating the site as a borrow area. Moreover, he knew of the exploration in 1972. He was described by Lloyd Berryman and his family as an astute businessman. It is inconceivable that he would not have fully comprehended the Bureau's expectation that it could use the property as a borrow pit.

d. Activities after the sale

The Burkeys were allowed to remain on the property until March 1, 1977, and were allowed to continue grazing operations until July 1, 1977. After that time they had no further rights in the surface estate.

On May 11, 1979, John Burkey died. He was incapacitated for a relatively short period before his death, but it is undisputed that between the time of the sale and his death, John Burkey did nothing to exploit the gravel on the property. It was not until excavation and construction began in 1984 that the subject of gravel arose. In January, 1985, Brooke Burkey was contacted by an attorney for Granite Construction Company. Granite was the general con-

tractor hired by the Bureau to build the dam. The attorney explained what Brooke and others had heard by rumor, that Granite was excavating gravel from the lake site, and was extracting placer gold in the process. The attorney invited Brooke Burkey to the construction site, apparently in the hope of striking some arrangement for paying the Burkey heirs for gold that might be removed from their former ranch.[2]

Brooke Burkey visited the site. By that time the topsoil and all familiar landmarks had been removed. It is unclear when Granite began excavating in earnest from borrow pit 500, but it is unlikely that it had begun by January. Whatever it had done alarmed Brooke Burkey, however. He returned with Jack Ellis, a geologist, and Harry Elam, of Elam Construction Co. The latter company uses large amounts of sand and gravel in its business. The two men told Burkey that the gravel remaining on the site was of a high quality. Elam tentatively offered 35 to 50 cents per ton. Those royalties would have been earned only on sale of the gravel, unlike a typical lease, where it is paid upon extraction.

What happened next is not clear. At some time after this second visit, Burkey and Elam were denied access to the property, and were told by Bureau representatives to forget their plans for removing the gravel, since the defendant asserted ownership. In May, 1985, Burkey contacted a lawyer with the firm of Younge & Hockensmith, Terry Slater, who was tasked with protecting the Burkey's interests in the gravel and gold. The Bureau directed him to Granite Construction to arrange for a site visit with Karl Poss, a Granite employee. Mr. Poss was in charge of the Granite operation, and showed Slater around. At that point, the only gravel that had been removed and processed through the washing and crushing facility had come from

the Swihardt property, downriver but adjacent to the Burkey parcel. Poss offered to let Slater know when and if excavation advanced across the boundary. In fact he did not.

A letter dated July 26, 1985, appears in the record, wherein Younge & Hockensmith asserted the Burkey's claim to ownership of the gravel on the land. It represented that the Burkeys were contemplating developing a placer gold recovery operation, and insisted that any further removal of gravel would constitute a trespass. A second letter is dated November 12, 1985. It relates that the Bureau had not responded to the July letter. It requested a meeting to discuss the issue, and insisted on an accounting of that which had already been removed.[3]

On December 4, 1985, the Bureau responded in writing. The Regional Director, Clifford Barrett, wrote that up to that point, approximately 1.7 million cubic yards of pit run material had been removed. Further, it was the Bureau's position that sand and gravel were non-mineral materials, and thus not reserved by the Burkeys. The next correspondence in the record is dated August 13, 1986. It was sent to the Bureau by Younge & Hockensmith. It relates that construction had stopped, and that the Bureau had previously indicated its willingness to permit extraction of gold on site, so long as the gravel was left in place. The Government's September reply iterates its position that the gravel could not be removed, but that it would consider any plan to extract any reserved minerals, presumably referring to gold.

Ultimately, 2.3 million cubic yards of pit run material from the Burkey site were used by the Bureau in construction of the dam. With the exception of some material that was dry processed to remove dirt, the majority of the material removed was sim-

---

**2.** Granite ultimately recovered $200,000 in gold from its gravel processing operation. There is no claim by plaintiff in this suit that this gold was recovered from its gravel. It seems unlikely that it would be, since most of the material removed from the Burkey site was used as pit run and was therefore unprocessed.

**3.** The testimony suggested that there had been telephone conversations between Slater and Bureau personnel in the interim, but no official response to the July letter. There is no question that the Bureau's position throughout was that it owned the gravel.

ply packed into the dam without processing or isolation of the gravel.[4] By the end of 1986, construction was complete and filling had begun. It took four years for the reservoir to fill. The lake is 200 feet deep at its deepest point. The dam impounds 80,000 acre feet of water. At the former Burkey site the water is approximately 100 feet deep. Thirty feet of that depth was created by the excavation.

Max Stodolski, the Bureau's chief engineer at the project, testified without contradiction that, after inundation, removal of the pit run material for subsequent extraction of gravel would have been commercially impracticable. The expense of dredging, along with the uncertainties created by the enhanced difficulties of getting necessary permits from the Corps of Engineers would mean that, for all practical purposes, the gravel would be inaccessible after the dam was built. The court finds that John Burkey and his heirs were aware, or should have been aware, of that fact. In view of the notoriety of the dam construction, the court also finds that the Shepardson heirs and Mrs. Flury knew or should have known the same thing.

It is undisputed that John Burkey did nothing to pursue commercial development of the gravel after sale of the property. Rather, what little interest he showed in minerals on his land concerned gold, not gravel. Mrs. Flury did nothing to exploit her half interest in the mineral estate until her sale of that interest to Mrs. Burkey in 1987. At no point did she contact the Bureau of Reclamation. In her view, if the mineral estate had any value, it would have been for its oil and gas potential. There was no direct evidence concerning the Shepardsons, but presumably if they had any interest in developing their mineral estate, it was left inchoate.

### e.  Consolidation of the mineral estate

On July 31, 1987, a document titled "Agreement for Assignment and Convey-

ance" was executed. The parties to it were the Shepardson heirs, Doris Burkey, then a widow, and Doris Flury, also a widow. Collectively, the parties owned 100% of the "oil, gas and minerals" on the property. The agreement recited several predicates, including the following:

E.  The Bureau of Reclamation ... has, through third parties, excavated gravel and other minerals from the property ...

F.  Burkey has previously advised the Bureau of her claims to the minerals, and forbidden the removal of minerals from the property, and the parties intend to develop the mineral deposits there to the maximum degree that is economically feasible.

G.  Burkey, Flury and Shepardson heirs have suffered injury as a result of the trespass by the Bureau upon their mineral rights and the conversion of minerals....

H.  Burkey has engaged Younge & Hockensmith, P.C., attorneys at law, to assert her claims against the Bureau and advance her legal rights to remove minerals from the property.

I.  The parties estimate that the costs to be incurred in developing the minerals on the property and pursuing their claims against the Bureau for its trespass on the property will be substantial.

In consequence of these premises, the Shepardson heirs and Mrs. Flury conveyed to Mrs. Burkey their "right, title and interest in minerals existing on or under the property. Shepardson heirs and Flury will deliver to Burkey a Quit Claim Deed to such minerals. Flury's Quit Claim Deed will not convey, however, her previously reserved 50% interest in oil and gas...." The record contains such a quit claim deed from Mrs. Flury. Presumably, a similar deed was executed by the Shepardsons. In addition, the agreement conveys to Mrs. Burkey "all rights, claims, and choses in

---

**4.**  Gravel is a term used loosely throughout the opinion, as it was by the parties. The material on the Burkey property that the parties referred to as gravel ranged in size from anything larger than sand up to rock one foot in diameter. If it had been used in making concrete, the gravel would have been washed and crushed.

action against the Bureau ... for trespass, conversion or other injury to their mineral estates on the property since June 15, 1955."

In consideration for these assignments, no money changed hands. Instead, Mrs. Burkey promised to pay the other parties "50% of all royalties or sale proceeds received with respect to, or damages recovered for trespass upon or condemnation or conversion of, all gold and silver now or heretofore existing on the property ..." In the event of royalties, sale proceeds, or damages relating to gravel, the payment to the other parties was to be only 20%. Payments were to be net of costs, which included legal expenses.

f. Additional evidence as to the meaning of reserved "minerals"

The parties presented a great deal of evidence in an effort to clarify the meaning of the term "mineral" in the reservation clause. It consisted of four types: legal usage, local or trade usage, evidence of subjective, i.e., undisclosed, intent, and finally, in addition to the evidence already discussed, evidence concerning the parties' actions or statements contemporaneous with the time of the sale.

As to its legal usage, plaintiff demonstrated that, in contexts' other than reserved mineral estates, the term mineral frequently embraces gravel. For example, land use regulations from Ouray County and two adjoining counties were introduced to show that gravel and sand operations are treated collectively with other extractive mining activities for zoning purposes. The San Juan County regulations in fact specifically define mineral to include gravel. The Colorado statute establishing the Mining Industrial Development Board, an advisory entity to the Governor and other state officials, defines "mining industry" to include businesses engaged in gravel removal. Colo.Rev.Stat. §§ 92–34–1, –2

(1963) (repealed 1974). Similarly, the state's Bureau of Mines, which has safety responsibilities, has the duty to inspect, among other things, gravel pits. Colo.Rev. Stat. § 92–32–5 (1963) (repealed 1974). In 1973, Colorado adopted a mining land reclamation act that specifically affected gravel operations. Colo.Rev.Stat. § 92–36–2 (1973) (repealed 1976). Indeed, it is this statute that added to the value of better gravel deposits. Plaintiff also introduced a portion of the Internal Revenue Code of 1976, along with testimony of an accountant, to demonstrate that gravel is treated as a mineral with respect to depletion considerations. See, I.R.C. §§ 611–614 (1976).

As to local usage, plaintiff offered the testimony of five individuals from Ouray County or nearby to demonstrate that the term mineral in a reserved mineral estate also embraces gravel. Frank Woodrow, an attorney, Earl Jensen, an accountant, and Harry Elam, who owns a construction company, testified that, within their disciplines, it was common practice to treat gravel as a mineral. When pressed for the bases for their statements, support fell into two categories: treatment of gravel as a mineral under the types of laws set out in the preceding paragraph,[5] and limited anecdotal evidence. To the extent their views are colored by statutes, tax practice, Bureau documents, or case law, the court is positioned as well as the witnesses to evaluate the significance of the support. Instead, the court views the anecdotal evidence discussed by these and two other witnesses to be of the most significance.

Woodward, an attorney, explained that his clients, who make concrete, deal with the owners of all the interests in a piece of property when they execute a gravel lease. He testified that he does not draft the lease documents, however, and was not aware of with whom leases are executed when there is a division of estate. Moreover, he did not recall an instance in which gravel was

**5.** Although it was not clear, Woodrow appeared to place primary reliance on the way the Bureau of Land Management treats gravel on lands under its jurisdiction. The court counts testimony based exclusively on case law as not proper subject matter for factual testimony. In any

event, for the reasons discussed below in connection with the decision in *Watt v. Western Nuclear, Inc.*, 462 U.S. 36, 103 S.Ct. 2218, 76 L.Ed.2d 400 (1983), practice in connection with those lands is distinguishable.

removed when only the mineral interest owner consented.

Richard Tisdell, an attorney, testified that mineral reservations are almost always general. On only one occasion in the many years he has reviewed deeds did the mineral estate specifically mention sand and gravel in addition to oil, gas, and other minerals. He knew of one instance in which a mineral estate owner mined gravel. Contrary to Earl Jensen, he testified that mineral interests in Ouray County are taxed, for property tax purposes, separate from the surface estate.

Jensen, who represented numerous gravel and cement companies, had had no personal experience with a client obtaining a gravel lease from a mineral estate holder only. Elam, whose company frequently buys gravel, testified that in exploring for sand and gravel deposits, his company gets permission from the surface estate owner, even when there has been a severance of title. He implied, however, without actually stating, that when his company executes a lease, it deals with the mineral estate holder. Warren Gibbs, a real estate agent, also testified of an instance in which he sold a piece of property, reserved a mineral estate, and later sold gravel off that property without complaint from the surface estate owners.

The defendant offered to rebut some of this evidence with the testimony of Nicholas Copeland, owner and operator of Montrose County Abstract Company. After affording the Government several opportunities to have Copeland explain the source of his view that the local understanding of mineral does not embrace gravel, the court struck his testimony as insufficiently predicated.

The Government did offer the testimony of David Crockett, a geologist. He explained that his profession draws a distinction between rocks and minerals. Minerals are naturally found chemical elements or compounds having a definite chemical structure and mutually characteristic crystalline forms. They are normally inorganic. By this definition, gravel would clearly not be a mineral. It could be characterized as a rock, or a soil type, or a mineral material, but not a mineral, because it has no specific chemical or crystalline structure. It can be composed of any number of elements or compounds. Under this analysis, granite or sandstone, for example, would not be minerals.

In the category of subjective intent, the court heard Mrs. Flury testify that she assumed gravel was included in her mineral reservation. In addition, Brooke Burkey stated that in his father's last illness, as he was explaining his financial affairs to his son, he reminded Brooke, "don't forget about our mineral interest." It also heard the evidence of Brooke Burkey that in the early 1970's his father improved an old wooden bridge across the river with a prefabricated metal bridge. Lloyd Berryman testified that the purpose of this was to anticipate heavier trucks and other equipment associated with removing gravel. As to this point, the court finds it unpersuasive of John Burkey's intent, for two reasons. First, as his son testified, the bridge was useful for the immediate purpose of making access to fields on both sides of the river safer for hay wagons and tractors. The bridge was in place for several years without any indication John Burkey was going to set up a gravel pit. The second reason is that Granite promptly replaced the bridge with a more substantial structure when it began excavating. The court concludes that John Burkey's primary motivation in replacing the bridge was not to prepare for a sand and gravel operation.

Government personnel involved with the Dallas Creek project assumed the Bureau was buying the gravel along with the surface estate. A letter dated November 28, 1979, from David Crockett, Mining Engineer for the Bureau, reflects this understanding. The government witnesses involved in the transaction all testified that it was their understanding that gravel conveyed with the surface estate. Clara Norris, the conveyance clerk who prepared the deed from standard forms, stated that "standard office practice" is that gravel is not a mineral for purposes of a reserved estate. Gilbert Davies, Director of the

Land Acquisition Branch of the Bureau's office at Montrose, testified to similar effect. Foster Lamb, the appraiser, and Oral Birch, the negotiator for the Bureau, both explained their understanding that, while gravel can be a commercially valuable resource, it is not treated as a reserved mineral in a reservation clause.

The final category of evidence as to meaning consists primarily of those circumstances surrounding the land acquisition that have already been discussed. There were additional pieces of documentary evidence, however, primarily relied on by plaintiff. Virtually every government document dealing with the Dallas Creek Project characterized sand and gravel as a mineral resource. This includes the 1972 Bureau of Mines mineral resources inventory, the 1972 Bureau of Reclamation feasibility study, the appraisal of plaintiff's land, as well as those of the other landowners in the area, and all three definitive plan reports prepared by the Bureau with respect to the dam. The only one of these documents definitely seen by John Burkey was the November 1972 Bureau of Mines report.

This action was commenced in the United States District Court for the District of Colorado, on July 1, 1988. Defendants were the United States and Granite Construction Company. On June 21, 1990, the action against the United States was transferred to this court. On February 12, 1992, it was assigned to this judge.

### DISCUSSION

The ultimate issue presented in this action can be simply phrased: Did the Burkeys' reservation of a mineral interest obligate the Bureau to pay for gravel removed in building the dam? Resolution turns on what was meant by the term "and other minerals" in the sales contract and the deed.

The law of the situs is applied in determining the nature of the property interest. *Foster v. United States*, 221 Ct.Cl. 412, 420, 607 F.2d 943, 948 (1979). Two decisions by the Colorado appellate courts are on point. In *Farrell v. Sayre*, 129

Colo. 368, 270 P.2d 190 (1954), the state supreme court was faced with the question of whether the grantor of the surface estate had reserved, by the mineral reservation, the right to be paid for gravel removed from the land. The reservation was general, as is the one at bar. The surface of the land consisted wholly of sand and gravel. The court observed that "It seems to be the general rule that where the surface of land is sand and gravel, a straight mineral reservation does not include the sand and gravel ..." *Id.*, 270 P.2d at 192. The general rule can be overcome in a given case, however, by an examination of the usage of the term in the vernacular of the mining world or world of commerce, or by consideration of what the particular parties contemplated. The court held that if the owner of the surface estate did not own the sand and gravel, he effectively owned nothing. *Id.* at 192.

To similar effect is *Morrison v. Socolofsky*, 43 Colo.App. 212, 600 P.2d 121 (1979). The court began with the general proposition that sand and gravel are not generally included within the definition of minerals in a reserved estate. *Id.*, 600 P.2d at 122. Although the appeals court held that it was not error for the trial court to admit evidence of local understanding of the term mineral, what was controlling was the parties' understanding that use of the surface by the purchaser as a farming operation would be incompatible with commercial extraction of gravel. *Id.* at 123. The court specifically held that the fact that the gravel underlay the surface, unlike *Farrell*, was of no importance. *Id.* To have reserved an interest in the gravel, the grantor had to list it in the reservation clause.

Decisions of other courts are overwhelmingly to the same effect. *W.S. Newell, Inc. v. Randall*, 373 So.2d 1068, 1069 (Ala.1979); *Harper v. Talladega County*, 279 Ala. 365, 185 So.2d 388, 390 (1966); *Fisher v. Keweenaw Land Ass'n*, 371 Mich. 575, 124 N.W.2d 784, 788 (1963); *Hovden v. Lind*, 301 N.W.2d 374, 378 (N.D.1981); *Holland v. Dolese Co.*, 540 P.2d 549, 550 (Okla.1975); *Heinatz v. Allen*, 147 Tex. 512, 217 S.W.2d 994, 997 (1949); *Winsett v.*

*Watson,* 206 S.W.2d 656, 658 (Tex.Civ.App. 1947); [6] *see also Bambauer v. Menjoulet,* 214 Cal.App.2d 871, 29 Cal.Rptr. 874, 876 (Dist.Ct.App.1963); *Holloway Gravel Co. v. McKowen,* 200 La. 917, 9 So.2d 228, 232 (1942). *See generally* 54 Am.Jur.2d *Mines & Minerals* § 8 (1971); A.G. Barrett, Annotation, *Clay, Sand, or Gravel as "Minerals" Within Deed, Lease, or License,* 95 A.L.R.2d 843 (1964); 58 C.J.S. *Mines & Minerals* § 155 (1948).

In *Roe v. State ex rel. State Highway Dep't,* 103 N.M. 517, 710 P.2d 84 (1985), *cert. denied sub nom. Baca v. Roe,* 476 U.S. 1141, 106 S.Ct. 2247, 90 L.Ed.2d 693 (1986), the New Mexico Supreme Court considered whether sand and gravel were covered by a mineral reservation clause. The land in question was purchased from the state, which reserved the right to "all minerals of whatsoever kind." The state highway department had removed gravel to a depth of thirty feet and the plaintiff surface estate owners sought compensation. The court noted that gravel was common in the area. Citing earlier decisions in New Mexico, it held that the state improperly removed the sand and gravel. If the material possesses no exceptional value to distinguish it from surrounding soil, it is not likely to be treated as a mineral in a reservation clause. Similarly, it will probably not be treated as a mineral if it cannot be obtained without destroying the surface.

The New Mexico Supreme Court distinguished in *Roe* the decision of the United States Supreme Court in *Watt v. Western Nuclear, Inc.,* 462 U.S. 36, 103 S.Ct. 2218, 76 L.Ed.2d 400 (1983). Since plaintiff here also places great reliance on *Watt,* it has to be addressed in some detail. That case dealt with lands patented under the Stock Raising Homestead Act of 1916 ("SRHA"), 39 Stat. 862 (repealed 1976). The act permitted persons to homestead certain designated unappropriated public lands for the purpose of raising cattle. Title could be obtained, but subject to a reserved interest in the United States to "coal and other minerals." Plaintiff in that case, Western Nuclear, Inc., was a successor in interest to such a patentee. It obtained the lands in question as a source of gravel for road paving purposes. The Bureau of Land Management challenged Western's extraction of gravel on the basis that the United States, as owner of the retained mineral estate, had the sole right to extract gravel.

In ruling against the surface estate owner, a divided Supreme Court held that, within the meaning of the SRHA, gravel was a reserved mineral. In coming to that conclusion, the Court held that the meaning of the term "mineral" is so imprecise that it had to resort to the purpose of the act. As to this, the Court noted:

> Congress' underlying purpose in severing the surface estate from the mineral estate was to facilitate the concurrent development of both surface and subsurface resources. While Congress expected that homesteaders would use the surface of SRHA lands for stockraising and raising crops, it sought to ensure that valuable subsurface resources would remain subject to disposition by the United States, under the general mining laws or otherwise, to persons interested in exploiting them. It did not wish to entrust the development of subsurface resources to ranchers and farmers. Since Con-

---

**6.** Similarly, in *Atwood v. Rodman,* 355 S.W.2d 206 (Tex.Civ.App.1962), a Texas case dealing with limestone, the court concluded that the parties' dealings at the time of execution of the reservation made it clear they were concerned about oil and gas, and not about "components of the surface" such as limestone. One factor the court considered is that removal of limestone had the potential of effectively destroying the surface estate. To like effect is *Beury v. Shelton,* 151 Va. 28, 144 S.E. 629 (1928): "In this country, [limestone] is part of the soil, and a conveyance that reserves the limestone with the right to remove it would reserve practically everything and grant nothing." 144 S.E. at 633. For that reason, a grantor expecting to reserve limestone would have to be explicit. *Id.*

Another decision involving limestone was *Campbell v. Tennessee Coal, Iron & R. Co.,* 150 Tenn. 423, 265 S.W. 674 (1924). The court there held that a reservation of limestone should have been explicit, for two reasons. First, because quarrying limestone has the effect of destroying the surface estate, a reservation of it would nullify the grant. The second was the general maxim that reservations in a deed should be construed against the grantor. *Id.,* 265 S.W. at 676.

gress could not have expected that stock-raising and raising crops would entail the extraction of gravel deposits from the land, the congressional purpose of facilitating the concurrent development of both surface and subsurface resources is best served by construing the mineral reservation to encompass gravel.

462 U.S. at 47, 103 S.Ct. at 2225.

The New Mexico court found that, since the lands at issue in *Roe* were not patented under the SRHA, the *Watt* decision was not controlling. For similar reasons, this court does not view the *Watt* decision as conclusive.[7] The property at issue here was not patented under the act, so the purpose of Congress is not an issue. What is relevant, however, is the Court's reliance on what Congress and the homesteaders would have understood to be the likely use of the surface estate by the homesteaders. In *Watt,* the Court found that Congress would have had no reason to suspect that ranchers and farmers needed to make use of the gravel. In the present case, the circumstances are directly to the contrary. The Burkeys had every reason to know that the Government not only wanted to flood their land, but that it wanted to remove the soil as part of creating a reservoir and building the earthen dam.

Two decisions of the Court of Claims bear on the issue. *Cumberland Mineral Co. v. United States,* 206 Ct.Cl. 797, 513 F.2d 1399 (1975), is remarkably similar to the case at bar. In that case, the Government had purchased in 1935 the fee interest in certain lands in Kentucky. The mineral interest was reserved. The land was incorporated into a national forest. That same year, the original owner sold his mineral interest to the plaintiff. Several years later, the Government constructed a dam, using both impervious clay materials and sandstone taken from the land at issue. The plaintiff brought a taking claim, asserting that the removal of materials violated its reserved mineral rights. The court noted first that sandstone and clay are not minerals in a geologic or chemical sense. 206 Ct.Cl. at 801, 513 F.2d at 1401. Nevertheless, the term is used in a broader sense normally, and the court held that it had to consider the " 'circumstances and conditions existing at the time.' " 206 Ct. Cl. at 803, 513 F.2d at 1401 (quoting *Dierks Lumber & Coal Co. v. Meyer,* 85 F.Supp. 157, 162 (W.D.Ark.1949)).

The court concluded that the parties could not have contemplated a reservation of the clay and sandstone, because removal of those materials by the reserved interest holder would have left for the Government only a "vast chasm," thereby wholly defeating the purpose of the original transaction. *Id.* It was also noteworthy to the court that, in the 35 years that elapsed between the plaintiff's securing the mineral interest and the Government's construction of the dam, the plaintiff itself had shown no interest in extracting sandstone or clay.

The Court of Claims relied in part on the decision of the Kentucky Court of Appeals in *Kalberer v. Grassham,* 282 Ky. 430, 138 S.W.2d 940 (1940). There the court held that the purchaser of the surface estate acquired rights to exploit an existing sandstone quarry. The Court noted that the seller knew of the buyer's business was quarrying. *Id.* 138 S.W.2d at 943. As the

---

**7.** The case was also distinguished in *Poverty Flats Land & Cattle Co. v. United States,* 788 F.2d 676 (10th Cir.1986), which involved lands patented under the now-repealed Taylor Grazing Act. Unlike *Watt,* the mineral reservation clause at issue was not dictated by the statute. Plaintiff was successor in title to the surface estate. The Government held the reserved mineral interest. The court had to determine which entity held the right to remove caliche, a salt-type residue deposited on the surface of land, but appearing in lower strata. Caliche has a varied chemical composition. There are extensive deposits of it in the Great Basin states.

The Tenth Circuit held that the Government had not reserved the right to remove caliche. Unlike the period of time considered in *Watt,* as of the time of the deed in *Poverty Flats,* Congress had passed the Surface Resources Act of 1955, Pub.L. No. 87–713, 69 Stat. 368 (codified at 30 U.S.C. § 611 (1986)). In that statute, it removed a large group of "common materials" from the category of minerals that, under mining laws, could be located on public lands in order to lay the basis for perfecting title. Caliche and gravel are among the materials listed in the statute as being "common." The circuit court found that the parties understanding should have been colored by the 1955 act.

court held, "it does not require a stretch of imagination to conclude that McQuire was familiar with or had a general knowledge of the affairs of the corporation and the business in which it was engaged ..." *Id.*

More recently, the Court of Claims decided *Foster v. United States,* 221 Ct.Cl. 412, 607 F.2d 943 (1979). In that action, the plaintiff, owner of a mineral interest in land that was part of a military reservation, sought compensation for the Government's denial of access to remove dolomite. The reservation clause preserved an interest in "oil, gas, asphaltum and other hydrocarbon substances and other minerals, including diatomaceous earth." The record there reflected that dolomite has a definite chemical and crystalline structure. Moreover, the original grantors were aware that sedimentary and ocean borne deposits in the area had commercial value, in part, as the court noted, because the reservation clause specifically mentioned diatomaceous earth. The court held that under applicable state law, the deed should be interpreted to effectuate the mutual intent of the parties, in light of all the attendant circumstances, and that that intent was to reserve dolomite to the sellers. 221 Ct.Cl. at 421–22, 607 F.2d at 949.

From these decisions and others, it appears that there is no dispute as to the general principles that apply. *Normally,* gravel is not treated as a mineral within the meaning of a general reservation of minerals clause. Nevertheless, it was abundantly clear from the evidence in this case, and it is the consensus of the decisional law, that the term "mineral" has no precise or fixed meaning. *Northern Pac. R. Co. v. Soderberg,* 188 U.S. 526, 530, 23 S.Ct. 365, 367, 47 L.Ed. 575 (1903); *Bumpus v. United States,* 325 F.2d 264 (10th

Cir.1963); *Atwood v. Rodman,* 355 S.W.2d 206 (Tex.Civ.App.1962).[8] In apparent recognition of the fact that most parties to land contracts have little understanding of chemistry or geology, courts consistently have held that it is particularly important to discern what the parties jointly understood by the language they used. *See Atwood,* 355 S.W.2d at 212; *Campbell v. Tennessee Coal, Iron & R. Co.,* 150 Tenn. 423, 265 S.W. 674 (1924). To do that, it is necessary to consider all the circumstances surrounding the transaction:

> It must therefore be acknowledged that the term [mineral] is ordinarily used to denote a class of things less comprehensive than the scientific definition, and that just what it does include varies in different instances, depending upon various things, and an examination of the numerous cases quickly shows that there is no practical guiding rule for use in all cases, but that what the term includes differs as the facts of each case differ, and what the courts attempt to do is to ascertain what the parties intended, determining this from the language employed in the instrument, if that may be done with certainty, and if doubtful, then to call to their aid the facts and circumstances surrounding the transaction, so the court may view it from the situation of the parties when the instrument was executed.

*Beury v. Shelton,* 151 Va. 28, 144 S.E. 629, 632 (1928); *see also Mueller v. Stangeland,* 340 N.W.2d 450, 454 (N.D.1983); *Campbell,* 265 S.W. at 677.

Courts have thus not only resisted using the term in the narrow geologic sense, but also decline to use it in the broadest sense to mean everything that is not "animal or vegetable." *State Land Bd. v. State Dep't*

---

**8.** When viewed in its etymological sense, the word "mineral" derives its meaning from the word "mine", which does not advance the analysis a great deal. The noun "mine" has been defined as an excavation in the earth from which ores, coal, or other mineral substances are removed by digging or other mining methods. *Atlas Milling Co. v. Jones,* 115 F.2d 61, 63 (10th Cir.1940), *cert. denied,* 312 U.S. 686, 61 S.Ct. 613, 85 L.Ed. 1124 (1941). The Supreme Court, in defining mineral lands, suggested that

the term refers to lands containing deposits of valuable, useful, or precious minerals in such quantities as to warrant spending the money to extract them. In other words, that they are lands that are more valuable for their mineral content than for agricultural or other uses. *Northern Pac. R. Co. v. Soderberg,* 188 U.S. 526, 531, 23 S.Ct. 365, 367, 47 L.Ed. 575 (1903); *Deffeback v. Hawke,* 115 U.S. 392, 404, 6 S.Ct. 95, 100, 29 L.Ed. 423 (1885).

*of Fish & Game,* 17 Utah 2d 237, 408 P.2d 707, 708 (1965); *accord Beury,* 144 S.E. at 632. What the word means, therefore, depends almost entirely on its immediate context. *Kalberer v. Grassham,* 282 Ky. 430, 138 S.W.2d 940, 943 (1940); *Puget Mill Co. v. Duecy,* 1 Wash.2d 421, 96 P.2d 571, 573–74 (1939).[9]

Plaintiff points to the broad usage of the term "gravel" in legal contexts other than reservation clauses. It is certainly true that in an accounting sense, and for purposes of land use planning restrictions and environmental laws that gravel extraction is considered generically indistinguishable from other types of mining activities. The court views this type of evidence as being of marginal value, however. As the Court suggested in *Watt,* legislative bodies can have particular reasons to include gravel within the scope of legislation, and those reasons may be irrelevant in other contexts. The very reason, for example, that gravel is generally considered to travel with the surface estate—because its extraction is so destructive—may be the same reason that land use and environmental legislation would include gravel within their coverage. Treating gravel as a mineral for tax accounting purposes merely recognizes that, unless it is taken out of a river bed, it is a non-renewing resource, regardless of whether it is removed by the surface owner or mineral estate holder.

Of more relevance was plaintiff's evidence that there was, local to the Ouray County area, a practice of allowing the mineral estate holder the right to remove of gravel. The difficulty with this evidence, analyzed above, is that it was entirely anecdotal, and relatively meager. The court was left with the impression that the issue rarely arises, but that there have been isolated instances in which the mineral estate holder was permitted without objection to extract gravel. There is sufficient confusion on the subject that gravel lessees prefer to deal with both estate holders.

There was, nevertheless, overwhelming evidence that the Bureau of Reclamation and the Bureau of Mines lump gravel and sand with ores and oil and gas in assessing the commercial or developmental prospects of land. They are referred to as mineral resources, however, and in testimony, were called "common" materials. Government witnesses struggled to explain the difference between minerals and "mineral materials," but apparently saw no contradiction between treating gravel along with placer gold as a "mineral resource," yet distinguishing the two in the context of a reservation clause. The court is sympathetic with the distinction, and concludes that it has its origin in both fact and law. As the cases discussed above make clear, gravel is a mineral in the sense that it is inorganic, made up of chemical components, exists in the earth, and has numerous commercial uses. It is different from other minerals, particularly metalliferous ones, however, in that it is extremely common, is used for its hardness or bulk rather than its chemical makeup, and is frequently part of the soil itself.

The Bureau's practice of listing gravel as a mineral resource, therefore, is not, in the court's view, inconsistent with the Government's position in this lawsuit. What is of relevance, however, is the fact that John Burkey had in his possession a copy of the Bureau of Mines' 1972 report, which treats gravel as a mineral resource, since this could have formed the basis of a common understanding between the parties. Giving this fact such significance is probably unrealistic, however, in view of the other circumstances, discussed below, and because Burkey appeared to have been interested in gold rather than gravel when he looked at the report. What he was interested in was apparently not the boilerplate prose in the report, but in the soil analysis of auger pit 501.

The factors militating in favor of the general rule that gravel was not reserved

---

**9.** Even then, there has to be some flexibility left to account for the fact that the parties may be aware at the time of the reservation that they do not know what is reserved. Room must be left

for the grantor of the surface estate, as well as uninformed transferees of that grantor, to keep, or get, "whatever there was," as Mrs. Burkey did.

are, on the other hand, considerable. First, there is the fact that none of the persons holding a reserved mineral interest took any steps to make commercial use of gravel during the time that they or the Burkeys held the surface estate. The highest and best use of the property was as a ranch, and large-scale excavation of gravel would have been inconsistent with that use. It is inconceivable to the court, for example, that the Burkeys would have permitted the Flurys or the Shepardsons to strip away the gravel in the fields.

Ironically, the considerations that normally support the general rule are uniquely not entirely applicable here, at least with respect to the sale by the Burkeys. The one circumstance in which an owner of the surface estate would not care whether a mineral interest holder extracted gravel, or at least if the extraction was done in the near term, would be if the land was about to be flooded. As between the Burkeys and the Government, therefore, there could not have been any concern about preserving the surface for ranching or farming. The same would not have been true, though, of the transfers between the Flurys and the Shepardsons, and the Shepardsons and the Burkeys. As to the latter deeds, it is hard to imagine a clearer case for application of the general rule.

If the Burkeys, as surface owners, had the right, as against the Flurys and the Shepardsons, to develop gravel, the question becomes, did they retain that right when they sold the surface estate to the Government? Even though it is plain that the Burkeys and the Government negotiators and drafters knew the Government had no use for the surface as such, it is equally clear that the special circumstances of that deed precluded retention of the gravel. As found above, John Burkey knew that the Government was planning to use the gravel and other soil materials on the ranch in building the dam. The time to have reached a separate understanding as

to the value of that gravel was when the sales contract was being negotiated. The fact that Burkey, a sharp businessman, did not do so can only suggest that he thought he was selling subject to the Government's use of borrow materials.

This is supported by the sales price. If the Burkeys had gotten their asking price when they were selling the ranch, they would have realized no more than $522,000. ($580,000 less ten percent commission) This is precisely the gross value of their contract with the Government, and is no doubt how John Burkey calculated his counteroffer.[10] Considering that the present suit seeks approximately $600,000 in additional compensation for the value of the gravel, the court is forced to conclude that the plaintiff is in effect suggesting that in 1976, the land and all the mineral interests were worth over $1,000,000. That is simply not credible. What is credible is that John Burkey understood that the land had no use to the Government as a ranch. But that it was obligated to pay him for the highest and best use at that time. If the highest and best use had been a gravel pit, the formal appraisal, and John Burkey's personal appraisal, would no doubt have reflected that fact. What John Burkey must have understood is that the Government had no obligation to pay twice for land that could only support one of two inconsistent uses.

If John Burkey had understood that he retained the right to remove the gravel, he also would have known that he had to act quickly to take advantage of that reservation. The mineral reservation, at least as to gravel and placer gold, would have been worthless after the reservoir filled. Having salvaged the house, it would have been logical to salvage the gravel. Yet in the three years that he lived after the sale, he did nothing to exploit the gravel. This can only be because he, like the Government

10. The fact that the Burkeys would have apparently retained a one-eighths mineral interest in the private sale, whereas they retained a one-quarter interest in the sale to the Government, the court views as of no consequence. It merely illustrates the point that John Burkey placed a relatively low value on the worth of the mineral estate, and had no expectation of being paid for the gravel he knew would be removed.

personnel involved, assumed that the property would be used as a borrow pit.

During closing argument, plaintiff's counsel raised an issue not addressed in the pretrial briefing. His point was that three quarters of Mrs. Burkey's present mineral interest was obtained by assignment from the Shepardson heirs and Mrs. Flury, parties not knowledgeable about the Government's particular purpose in buying the land.

 For two reasons, that fact does not assist plaintiff. First, as held above, the transfers between Flurys and the Shepardsons and the Shepardsons and the Burkeys, while long before 1976, should be subject to the general rule applicable in Colorado and elsewhere. Namely, that mineral estate holders do not retain rights in gravel when exploiting that resource, because it would be inconsistent with the transferee's use of the surface estate.

Second, the substance of the 1987 agreement and transfers was that Mrs. Burkey bought a chose in action, particularly with respect to Mrs. Flury, who retained rights to oil and gas. The other mineral estate holders obviously had no interest in removing gravel prior to that time, and had no expectation of doing so in the future. No money changed hands. It was only the lawsuit that showed a prospect of yielding a recovery. While there is no bar on transfer of mineral rights, there is a bar on assignment of claims against the Government. Insofar as relevant here, the Assignment of Claims Act, 31 U.S.C. § 3727 (1988), limits an assignee to assertion of claims that have already been allowed. *See United States v. Shannon*, 342 U.S. 288, 72 S.Ct. 281, 96 L.Ed. 321 (1952); *Cooper v. United States*, 827 F.2d 762 (Fed.Cir. 1987) (holding that after acquired title can be used to support a takings claim, but only where condition resulting in taking needed time to stabilize).[11]

11. *Foster v. United States*, 221 Ct.Cl. 412, 607 F.2d 943 (1979), is not to the contrary. The court specifically holds that transfer of mineral interests are not barred by the act, if the reservation includes "grantors, successors and assigns." 221 Ct.Cl. at 420 n. 6, 607 F.2d at 947 n.

## CONCLUSION

None of the mineral estate holders reserved a right to extract gravel. Accordingly, the defendant was permitted, as owner of the surface estate, to extract gravel from the lands at issue. The Clerk is directed to dismiss the complaint. No costs.

6. The deeds in the present case are not so expressed. More important, however, is the fact that the claim in *Foster* arose after purchase of a leasehold that had already granted rights functionally the same as the later assignment.