424 F.2d 148
 Charles Lamer CARLOCK, Merle Britting and George B. Powers, Plaintiffs-Appellees,
v.
NATIONAL CO-OPERATIVE REFINERY ASSOCIATION, a corporation, Defendant-Appellant, and
The Vickers Petroleum Co., Inc., a corporation, John S. Wertz, J. A. Vickers, Helen Vickers Springer, George Stallwitz and Robert F. Vickers, Trustees of the J. A. Vickers Testamentary Trusts, the J. A. Vickers Trust Estates and the Thomas Michael Vickers Trust (16 Trusts), Defendants-Appellants.
 Nos. 116-69.
 Nos. 117-69.
 United States Court of Appeals, Tenth Circuit.
 April 15, 1970.
 
 Robert Martin, Wichita, Kan. (William Porter, K. W. Pringle, Jr., W. F. Schell, Dale Fair, W. L. Oliver, Jr., W. V. Crank, Thomas C. Triplett, Wayne W. Wallace and Douglas K. Dusenbury, Wichita, Kan., on the brief), for appellants Vickers.
 Emmet A. Blaes, Wichita, Kan. (Paul H. Humann, Wichita, Kan., on the brief), for appellant National Co-operative Refinery Assn.
 Gerald Sawatzky, Wichita, Kan. (Foulston, Siefkin, Powers & Eberhardt, Wichita, Kan., of counsel on the brief), for appellee Carlock.
 Before PICKETT, Senior Circuit Judge, and BREITENSTEIN and HICKEY, Circuit Judges.
 HICKEY, Circuit Judge.
 
 
 1
 In this action the appellee Carlock seeks an accounting for profits due him by virtue of his 25% net profits interest in certain oil and gas leases which he received pursuant to an agreement executed between him and appellant Vickers Petroleum Co., Inc. (Vickers). The interest was subsequently assigned to appellant National Co-operative Refinery Association (hereinafter NCRA).
 
 
 2
 At a trial to the court below, the court held that Carlock had a 25% interest in the "net profits", as defined in the agreement between Carlock and Vickers, from the sale of oil and gas from the leases by virtue of their operation by Vickers, its successors and assigns (NCRA). Additionally, the court held Carlock entitled to a 25% interest in the "net profits" from the sale of the leases by Vickers to NCRA. Both NCRA and Vickers have appealed.
 
 
 3
 The basic issue is determination of what rights and obligations were created by the written instruments evidencing the transfer of certain mineral interests.
 
 
 4
 Appellee Carlock was the owner of oil and gas leases in an undivided interest in minerals under lands located in Oklahoma. By contract dated March 5, 1948, Carlock agreed to sell to Vickers these mineral leasehold interests and to obtain and sell to Vickers certain additional mineral leasehold interests under the same tract. In consideration for these transfers, Carlock received a 25% net profits interest in the property which was defined in the contract. The additional leases were obtained and transferred. For reasons not apparent on the record, Carlock sold, transferred and assigned his interest in the leases to Vickers on May 25, 1950. On December 20, 1950, an instrument labeled assignment and executed by Carlock and Vickers assigned and transferred to Carlock, his heirs, successors and assigns a 25% interest in the net profits realized by Vickers, its successors and assigns, "from the sale, management, operation and development of said oil and gas leases."
 
 
 5
 By instruments dated November 30, 1961, effective as of August 1, 1961, Vickers sold and assigned the oil and gas leases in which Carlock held his net profits interest together with a large number of other properties to appellant NCRA. There were intervening assignments among the Vicker interests preceding the transfer to NCRA which do not effect the issue presented in this case.
 
 
 6
 The instrument which created the Carlock net profits interest came into being after Carlock had divested himself of all his ownership in the leasehold estate to Vickers pursuant to the primary contract which was executory in nature. The second contract executed by both parties created the interest here in controversy. Consideration is recited and the interest of Carlock is extended by the words, "Carlock, his heirs, successors and assigns." The obligation of Vickers is expanded by the addition of the words "its successors and assigns." "The parties were of course free to alter, modify, abrogate or rescind the contract; * * *." Byers Transp. Co. v. Fourth Nat. Bank & Trust Co., Wichita, 333 F.2d 822, 825 (10th Cir. 1964).
 
 
 7
 The language contained in the clause creating the net profits interest is not ambiguous and clearly establishes that the successors and assigns of Vickers are obligated to comply with the terms of the agreement. The ascertainment of the foregoing conclusion makes it unnecessary to determine whether or not the instrument is a covenant running with the land. Therefore we conclude that NCRA has the continuing obligation to account to Carlock and pay over the profits resulting as described in that part of the assignment which deals with the manner in which profits will be ascertained. All parties agreed to this conclusion in oral argument to this court.
 
 
 8
 The agreement provides that net profits are to be determined by deducting from gross income the purchase price paid for the leases, among other things. The trial court held that NCRA was entitled to have net profits computed as provided in the agreement. Since we hold that NCRA's liability arises by virtue of its succession to Vickers under the contract, we agree. Although it does not affect our disposition of this issue, it is interesting to note that the trial court held in findings supported by the record that NCRA was aware of Carlock's interest when it purchased the property.
 
 
 9
 The question raised by Vickers relative to the obligation to pay a percentage of the profits arising from the sale of the leasehold interest presents a number of complex problems of interpretation.
 
 
 10
 The initial argument that Carlock's claim was in the alternative is answered by the pretrial order. "Plaintiff [Carlock] contends his 25% net profits interest is binding on Vickers, and on successors and assigns of Vickers, and that he is entitled to an accounting for 25% of the net profits on the operation and sale of such leases by Vickers and the intervening trustees, and to an accounting for 25% of the net profits arising out of operation since the sale to defendant NCRA."
 
 
 11
 Alternative or hypothetical claims in complaints should be set forth specifically at the time of pretrial conference, wherein all issues in the case should be formulated and simplified. Stanley v. Harper Buffing Machine Co., 28 F.R.D. 579, 582 (D.Conn.1961); Davis v. Cities Service Oil Co., 420 F.2d 1278, (10th Cir. 1970); Century Refining Co. v. Hall, 316 F.2d 15, 20 (10th Cir. 1963). "[S]uch [pretrial] order when entered controls the subsequent course of the action, unless modified at the trial to prevent manifest injustice." Fed.R.Civ.P. 16. The record does not reflect a modification, therefore the quoted portion of the pretrial order governs the claim made.
 
 
 12
 Vickers next contends that the court's construction of the net profits assignment was in a manner contrary to the intention of the parties to the transaction and suggests that the trial court gave weight exclusively to its own linguistic education and experience and thereby made a contract not contemplated by the parties.
 
 
 13
 The trial court's determination as explained in its findings of fact, places great weight upon the language and grammar of that part of the agreement which provides, "* * * (25%) interest in the net profits realized by The Vickers Petroleum Co., Inc., its successors and assigns, from the sale, management, operation and development of the following described oil and gas leases * * *."
 
 
 14
 Vickers contends that Carlock testified that he did not intend that Vickers would sell the property when he transferred it to them. The inference is that Carlock agrees that net profits from a sale of the properties was never intended to be included in the agreement between the parties. The testimony relied upon is:
 
 
 15
 "Q. (By Mr. Powers) In other words, the Court wants to know exactly what your intention and what you thought you were getting in this transaction.
 
 
 16
 "A. Number One, I thought this was the finest company and I had been doing business with them for thirty-five years, Number One.
 
 
 17
 "Number Two, they had never sold properties. And I never intended for them to ever sell the property.
 
 
 18
 "Number Three, I intended to have one-fourth of the cash profits from the sale of any oil or gas or material ever sold from the property after they get their money back.
 
 
 19
 "Q. That is what you thought when you made the deal?
 
 
 20
 "A. Yes, sir, yes, sir.
 
 
 21
 "Q. Did you have any intention whatever of giving them authority to actually sell your interest?
 
 
 22
 "A. No, sir.
 
 
 23
 "Q. You still in this case desire to retain your interest in that property?
 
 
 24
 "A. Yes, sir.
 
 
 25
 "Q. You understand there are deep rights that have not yet been developed?
 
 
 26
 "A. Yes, sir.
 
 
 27
 "Q. Did you have any expectation that anybody ever would construe that instrument to mean that they could sell your 25 per cent interest?
 
 
 28
 "A. No. No, I never thought of ever selling anything. I didn't expect them to.
 
 
 29
 "Q. You made a statement I want to enlarge on just a little. You said they had never sold any interests. Actually what was the philosophy of the party you dealt with, had they ever been in the habit of selling, buying and selling interests?
 
 
 30
 "A. No.
 
 
 31
 "Q. Did Vickers ever sell property, to your knowledge?
 
 
 32
 "A. I never knew them to sell any property before.
 
 
 33
 "Q. So your expectation was that whenever it became a net profit interest, you would have that forever unless you sold it?
 
 
 34
 "A. That is right.
 
 
 35
 "Q. That is your position right today?
 
 
 36
 "A. Yes, sir.
 
 
 37
 "Q. That is what you desire the Court to find in this case?
 
 
 38
 "A. Yes, sir."
 
 
 39
 The court refused to draw the inference and thereby eliminate the effect of the word "sale" from the agreement. The pretrial order discloses that there is a difference of opinion between the parties to the agreement on the construction and interpretation of the phrase containing the word "sale". In interpreting a contract where resort must be made to extrinsic evidence and more than one inference may be drawn therefrom, a question of fact is presented. United States v. Continental Oil Company, 364 F.2d 516, 522 (10th Cir. 1966). The trial court rejected the meaning given the words by Vickers and accepted Carlock's contention as set forth in the pretrial order. We cannot conclude this was clearly erroneous.
 
 
 40
 Under Oklahoma law contracts are to be interpreted by rules set out in statute form. See 15 Okla.Stat.Ann. § 151 et seq. Where there is uncertainty as to meaning of the terms of a contract, the construction given by one of the parties may be considered and adopted, even though the instrument is susceptible to another construction. Kelso v. Kelso, 225 F.2d 918 (10th Cir. 1955). "Every word, phrase or part of a contract should be given a meaning and significance according to its importance in the context of the contract." Phillips Petroleum Co. v. McCormick, 211 F.2d 361 (10th Cir. 1954). See also Frankfurt Oil Company v. Snakard, 279 F.2d 436 (10th Cir. 1960); 3 Corbin on Contracts § 543 at 140. The construction given to the instrument by the trial court was therefore correct in the light of the evidence adduced on the record and examined by us. Carlock is entitled to 25% of the net profits received by Vickers as a result of the sale to NCRA.
 
 
 41
 Vickers next objects to the allocation of cost relied upon by the trial court to arrive at the figure used to determine the amount due Carlock on the sale of the leasehold interest. The sale from Vickers to NCRA was a sale of a large number of leasehold interests which included the ones in which Carlock had an interest. A separate purchase price was not allocated for the leases when they were sold in bulk. The only evidence on the value of the Carlock leases was an allocation made by NCRA in its internal audit for tax depreciation purposes. Vickers did not avail themselves of the opportunity to put on evidence establishing a value different than the NCRA value. The evidence indicates the NCRA value was arrived at by competent technical exploration and evaluation evidence by petroleum engineers. It was the only available evidence on the issue. The challenge directed against this evidence questions its credibility. The court found it credible and relied upon it to sustain the judgment. The exercise of its discretion in this matter is final. 1 Wigmore on Evidence § 16(c) at 311 (3rd ed. 1940).
 
 
 42
 The final issue is raised by Carlock and it is whether this court should award Carlock just damages for delay and double costs under 28 U.S.C. § 1912.
 
 28 U.S.C. § 1912 provides:
 
 43
 "Where a judgment is affirmed by the Supreme Court, or a court of appeals, the court in its discretion may adjudge to the prevailing party just damages for his delay, and single or double costs."
 
 
 44
 Rule 38 of the Fed.R.App.P. provides for such damages and costs if it is determined the appeal is frivolous.
 
 
 45
 The argument lacks merit in this case. Authority cited by NCRA and by Vickers indicates that in cases where such an award has been made, the appellate court has found that the appeal was made for the obvious purpose of delay and that the appeal was frivolous and vexacious. See Emaldio v. Pocahontas S.S. Co., 355 F.2d 55, 57 (4th Cir. 1966). The mere complexity of the case and the problems evidenced at the trial level by the several memorandums of opinion by the trial court in themselves indicate that an appeal was not frivolous.
 
 
 46
 Damages for delay and double costs are denied and the trial court is affirmed.
 
 
 47
 Affirmed.