**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 5 1999**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA, on its own behalf and on behalf of the Southern Ute Indian Tribe,

    Plaintiff-Counter-Defendant - Appellee,

v.

LULU MAE HESS; LOYD HESS; ALTON HESS; LLH DEVELOPMENT CORPORATION,

    Defendants-Counter-Claimants - Appellants.

No. 98-1127

---

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 95-Z-1894)**

---

Elizabeth Ann Peterson (Henry Solano, United States Attorney, Denver, Colorado; Lois G. Schiffer, Assistant Attorney General, Department of Justice, Washington, D.C.; Michael E. Hegarty, Assistant United States Attorney, Denver, Colorado; Robert L. Klarquist, Department of Justice, Washington, D.C.; Janet Spaulding, of counsel, United States Department of the Interior, Albuquerque, New Mexico, with her on the brief) of the United States Department of Justice, Washington, D.C., for Plaintiff-Counter-Defendant - Appellee.

George Robert Miller of McDaniel, Baty & Miller, LLC, Durango, Colorado, for Defendants-Counter-Claimants - Appellants.

Christopher G. Hayes, Craig R. Carver, and Don H. Sherwood, of Alfers & Carver, LLC, Denver, Colorado, filed a brief for amicus curiae The Colorado Rock Products Association and the National Stone Association.

Michael E. McLachlan and Jeffrey P. Robbins, Durango, Colorado, filed a brief for amicus curiae Board of County Commissioners of La Plata County, Colorado.

_____

Before **BRORBY, HOLLOWAY** and **LUCERO**, Circuit Judges.

_____

**BRORBY**, Circuit Judge.

_____

This appeal arises from an action brought by the United States against Appellants Lulu Mae Hess, Loyd Hess, Alton Hess and LLH Development Corporation (collectively referred to as the "Hess family"). The government seeks quiet title to ownership of gravel located on a ranch acquired by the Hess family as successors-in-interest following a land exchange patent issued pursuant to the Indian Reorganization Act of 1934, 25 U.S.C. §§ 461 - 479. At issue is whether the reservation of "all minerals" in the exchange patent, as reserved by the government in trust for the Southern Ute Indian Tribe, includes "gravel" as a matter of law. We exercise jurisdiction under 28 U.S.C. § 1291.

HISTORICAL BACKGROUND

The issue before us requires a brief examination of the ownership history of the land on which the mineral interest is claimed. In 1868, the government set aside almost sixteen million acres as an Indian reservation for the Confederated Bands of Utes. *United States v. Southern Ute Tribe or Band of Indians*, 402 U.S.

159, 162 (1971). Under the Act of 1880, the Southern Ute Indian Tribe ceded their portion of the reservation to the United States in exchange for cash payments and allotment of land along the La Plata River to individual Tribe members.[1] The purpose of the Act was to dismantle the Ute reservation, and thereby destroy the tribal structure, change the Utes' nomadic ways, and convert them from a pastoral to an agricultural people. *Southern Ute Tribe*, 402 U.S. at 163 (citing 10 Cong. Rec. 2059, 2066 (1880)); *see also United States v. Southern Ute Tribe*, 423 F.2d at 349. The government in turn sold the ceded reservation land for cash, set portions aside for public purposes, or disposed of it as free homesteads under various public land and homestead acts. *See Southern Ute Tribe,* 402 U.S. at 160-61; *Amoco Prod.*, 874 F. Supp. at 1148. One of the last homestead acts Congress passed for the purpose of opening ceded, non-allotted lands to public entry and settlement was the Stock-Raising Homestead Act of 1916.[2] This Act provided for the settlement of homesteads on lands where the surface was deemed "'chiefly

---

[1] *See United States v. Southern Ute Tribe or Band of Indians*, 423 F.2d 346, 348-50 (Ct. Cl. 1970), *reversed on other grounds*, 402 U.S. 159 (1971); *Southern Ute Indian Tribe v. Amoco Prod. Co*., 874 F. Supp. 1142, 1148 (D. Colo. 1995), *reversed on other grounds*, 119 F.3d 816 (10th Cir. 1997).

[2] 39 Stat. 862, ch. 9 (codified at 43 U.S.C. §§ 291-302) (repealed by the Federal Land Policy and Management Act of 1976, 90 Stat. 2743, 2789, § 7 (codified at 43 U.S.C. §§ 1701-1782 (1976)); *see also Watt v. Western Nuclear, Inc.*, 462 U.S. 36, 38 & n.1 (1983).

valuable for grazing and raising forage crops," and reserved to the United States "all the coal and other minerals'" in lands patented under the Act. S*ee Western Nuclear*, 462 U.S. at 38-39 (quoting 43 U.S.C. §§ 291, 292, 299).

In the 1930s, the government "initiated a marked shift in Indian policy from 'allotment and assimilation' which deemphasized tribal existence ... to a 'revival of tribalism.'" *See Amoco Prod.*, 874 F. Supp. at 1151. This self-determination policy culminated in the Indian Reorganization Act of 1934 which authorized the Secretary of the Interior to restore tribal ownership in the remaining surplus lands of any Indian reservation. *Id.* (citing 25 U.S.C. § 463). As a result of this and other acts of Congress, the Southern Ute Tribe's reservation became

> a checkerboard of different types of ownership interests including tribal lands held in trust by the United States for the benefit of the Tribe, lands held by the Tribe in its own name, individual Indian land allotments subject to federal trust restrictions, land owned in fee simple by individual Indians, and lands held in fee simple by non-Indians.

*Id.* (citing *Southern Ute Indian Tribe v. Board of County Comm'rs*, 855 F.Supp. 1194, 1196 (D. Colo. 1994)). In order to remedy this "checkerboarding" and effectuate "land consolidations between Indians and non-Indians within the reservation," Congress included a provision in the Indian Reorganization Act authorizing the Secretary of the Interior to acquire, through purchase, exchange or relinquishment, any interest in lands within the reservation for the benefit of the

-4-

Indian tribes. 25 U.S.C. §§ 463, 463e. The Act's only relevant condition concerning exchanges involved a requirement that the lands exchanged be of "equal value." *Id.* at § 463(e).

With this legislative and historical background in mind, we next chronicle the Hess family's acquisition of the property at issue. In 1935, Lulu Mae Hess' father, Arvil Brown, proved-up his homestead under the Stock-Raising Homestead Act and received a United States patent for 640 acres located in La Plata County, near Durango, Colorado, and adjacent to reservation lands eventually restored to the Southern Ute Tribe. Pursuant to the provisions of the Stock-Raising Homestead Act, Mr. Brown's land patent contained a reservation to the United States of "coal and other minerals."

In 1941, in conjunction with the Secretary of the Interior's authority under the Indian Reorganization Act, the government began several years of negotiations with Mr. Brown for the purpose of exchanging his 640-acre homestead for 440 acres of land held by the government in trust for the Southern Ute Tribe. The purpose of the exchange was to consolidate the Tribe's lands into manageable, contiguous tracts.

As part of the government's proposed land exchange, an appraiser viewed both properties in 1945, valuing each at $770 and assigning no value to the properties' oil, gas and mineral rights. Following the appraisals, the Ute Tribal Council agreed to the exchange by formal resolution. However, because Mr. Brown did not own, and therefore could not convey, the mineral rights to his homestead, the Superintendent of the Southern Ute Agency recommended to the government that "a reservation should be made on the lands ... proposed for exchange with Mr. Brown." In June 1946, Mr. Brown signed an Offer to Convey his homestead which contained the government's added reservation "that all oil and gas, coal and other minerals" be reserved for the Southern Ute Tribe. On July 1, 1946, Mr. Brown deeded his homestead to the government.

For the next two years, various government officials and agencies examined the details and filing requirements involved in the land exchange and determined the exchanged lands were of equal value, and the reservation of minerals would not adversely affect the administration, use or value of the land. Finally, on October 6, 1948, the government issued an exchange patent to Mr. Brown "subject to the reservation of all minerals in and to the land, including oil and gas, to the United States for the use and benefit of the Southern Ute Tribe."

In 1963, Mr. Brown's daughter, Lulu Mae Hess, and her husband, Loyd Hess, purchased the 440 acres of Tribal land Mr. Brown acquired by exchange (*i.e.*, the Hess Property). In 1968, the Hess family began extracting Animas gravel from a pit (Hess pit) located on their property for use on their roads and to construct a feed lot. It is important to note that an extremely large volume of commercial grade gravel, known as "Animas" gravel, comprises the surface, or near-surface, of the ground in the area surrounding Durango, Colorado, and is of similar quality throughout the region. Almost all of the Hess property is underlaid with gravel, including commercial quality "Animas" gravel deposits and noncommercial quality "Florida" alluvial and colluvial gravels.

In 1980, the Hess family used gravel from the Hess Pit and another pit on their property to construct roads in a subdivision created on their property known as Juniper Heights.[3] Later, Lulu Mae and Loyd Hess' son, Alton Hess, sold the

---

[3] In 1993, the Hess family obtained approval from the County Commissioners to develop another subdivision on their property, known as "San Juan Vista Estates." The Tribal Council expressed concern over the proposed subdivision based on the future mineral development potential of the property. On appeal, the Hess family suggests the Tribe's claim to the oil, gas and gravel deposits on their property prevents them from subdividing or selling their property and has caused them to lose over one million dollars in revenues. However, because the Hess family did not raise this claim in their counterclaim, we decline to address it on appeal. *See Singleton v. Wulff*, 428 U.S. 106, 120 (1976).

leftover Animas gravel from the Hess Pit area to local ranchers. Three years later, Alton Hess obtained a gravel lease from his parents and began obtaining state and county permits for operation of the Hess pit, using the name "Sunnyside Gravel." In 1984, Alton Hess erected a 4' by 4' business sign on the state highway near the Hess family property which states:

SUNNYSIDE GRAVEL
247-1596
GRAVEL, TOPSOIL, HAULING, EXCAVATION

He also placed a "permit sign" at the turnoff of the highway giving the required notice concerning his operation of the gravel pit. In addition, the Hess pit is clearly visible from numerous locations on the Southern Ute Tribal lands. Alton Hess also has placed advertisements in the yellow pages of the Southwest Colorado telephone directory every year since 1985. Similarly, he distributed numerous brochures and placed numerous advertisements in the Durango Herald offering gravel for sale.

Between 1983 and 1996, Alton Hess removed approximately 147,619 cubic yards of Animas gravel from the Hess pit for the Hess family's use, for small individual sales to local ranchers for private road use, and for sale to the Colorado Department of Transportation for use on roads apparently located near the Hess property. Because of the long haul distance and exorbitant cost of trucking the

gravel to distant markets, the Hess family claims the gravel on their property is only marginally economic and can only compete for an extremely restricted local and rural market. The parties dispute whether the useable Animas gravel deposits would have been considered commercial quality at the time Mr. Brown exchanged his homestead for this land. The parties generally agree the gravel located on the Hess property cannot be mined without disturbing or destroying the usefulness of the surface.[4]

PROCEDURAL BACKGROUND

It is against this historical backdrop and the Hess family's utilization of the gravel deposits that the government seeks quiet title to the mineral interest in the Hess property and to recover damages for trespass. In 1995, the United States on behalf of the Southern Ute Indian Tribe filed its complaint requesting that the district court declare the sand and gravel located on the Hess property a mineral, within the terms of the mineral reservation in the exchange patent; quiet title to the sand and gravel in the name of the United States as trustee for the Tribe; enjoin further mining by the Hess family; and award it a monetary judgment for

---

[4] We recite primarily those facts necessary for resolution, or an understanding, of the issues presented on appeal, leaving further relevant findings of fact for determination by the district court on remand.

trespass damages caused by the Hess family's past mining activity.

In turn, the Hess family filed an answer raising several affirmative defenses, including a contention that any damages for trespass are barred by the statute of limitations, and counterclaimed to quiet title to the sand and gravel deposits in their name, claiming ownership through the surface estate patented to Arvil Brown. Thereafter, the parties filed cross-motions for summary judgment for title to the gravel located on the Hess property. At a hearing on the summary judgment motions, the district court declined to consider evidence of the intent of the parties involved in the exchange and issued a bench ruling denying the Hess family's summary judgment motion, determining: (1) federal law, not state law, controls the construction of the exchange patent, and (2) as a matter of law, the mineral reservation contained in the Brown exchange patent reserves gravel to the United States for the benefit of the Tribe. At a trial on the remaining issues, the district court rejected the Hess family's contention that the statute of limitations completely barred the government's trespass claim for damages, and entered a final order and judgment awarding the United States $59,946.53 for the value of the gravel extracted after April 29, 1989, together with prejudgment and post-judgment interest. Appellants filed a motion for new trial which the district court denied. This appeal followed.

On appeal, the Hess family raises a host of issues challenging the district court's summary judgment determination that gravel is a "mineral" under the mineral reservation contained in the exchange patent. In addition, the Hess family asserts the district court erred in failing to: (1) consider the parties' intent in making the exchange; (2) apply state law; and (3) bar the government's damage claim under the applicable statute of limitations for trespass, and its title claim under the principles of equitable estoppel.[5]

## STANDARD OF REVIEW

The determinative issue in this appeal is whether the reservation of "all minerals" in the exchange patent, as reserved by the government in trust for the Southern Ute Indian Tribe, includes "gravel." The district court granted summary judgment to the United States, relying primarily on the Supreme Court's holding in *Western Nuclear*, 462 U.S. 36, in determining that gravel is a "mineral" as a

---

[5] The County Commissioners of La Plata, Colorado, and The Colorado Rock Products Association and the National Stone Association (Associations) filed amicus briefs on behalf of the Hess family. In its brief, La Plata County asserts the district court's ruling that gravel is a "mineral" as a matter of law will have far-reaching impacts beyond the Hess property at issue, including surface rights the county owns on the same Indian reservation. The Associations represent member gravel operators who, in part, own or lease surface rights nationwide for extraction of sand and gravel. They claim their expectations, as to their right to extract those materials, will be greatly disturbed by a ruling that gravel is a "mineral" as a matter of law.

matter of law.

We review the grant of summary judgment *de novo*, applying the same legal standard used by the district court under Federal Rule of Civil Procedure 56(c). *Utah v. Babbitt*, 53 F.3d 1145, 1148 (10th Cir. 1995). Summary judgment is appropriate if no genuine issues of material fact exist, and the government as the moving party is entitled to judgment as a matter of law. *Id.* We construe the facts and record in the light most favorable to the Hess family as the party opposing the motion. *Id.* We also review *de novo* the district court's interpretation of the federal statute at issue – the Indian Reorganization Act of 1934. *Id.* In construing a federal statute, we "'give effect to the will of Congress, and where its will has been expressed in reasonably plain terms, that language must ordinarily be regarded as conclusive.'" *Negonsott v. Samuels*, 507 U.S. 99, 104 (1993) (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 570 (1982)).

DISCUSSION

A. Quiet Title Action

Because the district court relied primarily on *Western Nuclear*, in quieting title to the gravel in the government on behalf of the Tribe, our analysis begins

with an examination of that decision. In *Western Nuclear*, a mining company acquired a fee interest in land covered by a patent issued under the Stock-Raising Homestead Act, and began removing gravel from a pit located on its land. 462 U.S. at 39-40. A dispute arose with the government over the ownership interest in the gravel. *Id*. at 40-41. Because Congress explicitly reserved all "minerals" in the Act itself, the United States Supreme Court limited its analysis to a study of congressional intent. *Id.* at 44, 52. In so doing, the Supreme Court determined that because the Act expressly applied only to lands where the surface was deemed "'chiefly valuable for stock-raising and raising forage crops,'" Congress intended homesteaders to use only the surface of lands patented under the Act. *Id.* at 50, 53 (quoting 43 U.S.C. § 292). The Court further reasoned that because Congress *statutorily* reserved all mineral interests in the government, Congress expected the government to retain any valuable subsurface resources, including gravel. *Id.* at 53. Hence, the Court declared that "gravel is a mineral reserved to the United States in lands patented under the [Stock-Raising Homestead Act]." *Id.* at 59-60.

The district court summarily concluded the *Western Nuclear* ruling must extend to this case because the Indian Reorganization Act of 1934 enveloped the same polices as the Stock-Raising Homestead Act of 1916.We disagree.

-13-

This case involves an "exchange" patent issued pursuant to the Indian Reorganization Act, and not a "land grant" patent issued under the Stock-Raising Homestead Act. These Acts are very different with respect to their treatment of mineral reservations. Unlike the Stock-Raising Homestead Act, the Indian Reorganization Act makes no mention of mineral reservations and thus, does not statutorily mandate the reservation of minerals in patents issued under it. Instead, the Indian Reorganization Act provides the Secretary of Interior with complete discretion to negotiate and issue exchange patents with or without mineral reservations so long as the lands exchanged are deemed of equal value. 25 U.S.C. § 463e; *see also* 63 I.D. 408, 410-11, Sol. Op. No. M-36393 (Dec. 26, 1956). Recognizing these two Acts differ considerably on the issue of the reservation of mineral interests, we cannot conclude, without further analysis, that the holding in *Western Nuclear* applies to this case as "a matter of law."

In so proceeding, we are struck by the similarity of the Indian Reorganization Act to another land act passed by the same Congress in the same year – namely, the Taylor Grazing Act of 1934, 48 Stat.1269 (codified at 43 U.S.C. §§ 315-315(o)). Specifically, we note the provision in the Indian Reorganization Act authorizing the Secretary of Interior to acquire land by exchange is strikingly similar to a provision in the Taylor Grazing Act, which

states:

> [T]he Secretary [of Interior] ... is authorized and directed to accept on behalf of the United States title to any privately owned lands within the exterior boundaries of said grazing district, and *in exchange therefore to issue patent ... not to exceed an equal value* of surveyed grazing district land or of unreserved surveyed public land ....

43 U.S.C. § 315(g) (repealed 90 Stat. 2792 § 705(a) (1976) (emphasis added)).

While both the Indian Reorganization Act and the Taylor Grazing Act authorize the Secretary of Interior to issue exchange patents, the Taylor Grazing Act, unlike the Indian Reorganization Act, contains some language concerning mineral reservations. In short, it expressly allows the parties to a land exchange to reserve minerals so long as mineral values are duly considered in determining the value of the exchanged lands. *Id.* While the Taylor Grazing Act specifically mentions mineral reservations and the Indian Reorganization Act does not, both Acts are nevertheless alike, and dissimilar to the Stock-Raising Homestead Act, because they contain no congressional mandate for the reservation of mineral interests and instead leave such reservations to the sole discretion of the Secretary of the Interior.

Bearing in mind the similarities of the Indian Reorganization and Taylor Grazing Acts, we proceed to our decision in *Poverty Flats Land & Cattle Co. v.*

-15-

*United States*, 788 F.2d 676 (10th Cir. 1986), which we find helpful in resolving the issue before us. In *Poverty Flats*, a dispute arose over an exchange patent issued under the Taylor Grazing Act. *Id.* at 677-78. The exchange patent contained an express reservation to the United States of "[a]ll mineral deposits." *Id.* at 677. Because the Act did not mandate the reservation of minerals and provided the Secretary of Interior with complete discretion in making land exchanges with or without mineral reservations, we held no congressional intent or expectations as to the meaning of "minerals" in the patent existed. *Id*. at 678. Thus, we concluded that the congressional intent, as to the meaning of "minerals," as articulated in the Stock Raising Act and relied on by the Supreme Court in *Western Nuclear,* did not exist with respect to the Taylor Grazing Act. *Poverty Flats*, 788 F.2d at 678. Applying the same analysis, we hold that because Congress did not mandate a reservation of minerals in the Indian Reorganization Act, but provided the Secretary with discretion to make such reservations, no congressional intent or expectation existed as to the meaning of "minerals" in the patent before us.[6]

---

[6] Even though the result is different, our holding is consistent with our decision in *Millsap v. Andrus*, where, like *Western Nuclear*, we considered the congressional intent of the meaning of "mineral" because Congress enacted a statute which explicitly mandated the reservation or disposition of minerals on the lands affected. 717 F.2d 1326, 1327-28 (10th Cir. 1983) (holding that congressional intent as to meaning of minerals must be examined because patent was issued pursuant to the Osage Allotment Act of 1906, which explicitly

Our conclusion is supported by an examination of Congress' overall purpose in passing the Indian Reorganization Act. While the purpose of the Stock-Raising Homestead Act was to transfer to the grantee surface lands deemed "chiefly valuable for stock-raising and raising forage crops," *id.* at 681, the purpose of the Indian Reorganization Act did not center on the patentee's intended use of either the surface or subsurface of the patented lands. Rather, the Act itself states that its purpose is to restore lands to tribal ownership and effectuate "land consolidations between Indians and non-Indians within the reservation." 25 U.S.C. §§ 463, 463e. Thus, the exchange provision in the Indian Reorganization Act, like that in the Taylor Grazing Act, does not assume the land patented by the government will be used for livestock grazing or raising crops. *See Poverty Flats,* 788 F.2d at 681. As we stated in *Poverty Flats*:

> Since the exchanges need not have been of grazing lands of the Government it cannot be assumed ... that the surface use was preordained .... Nor can we say as the Court did in *Western Nuclear* that "the determination of whether a particular substance is included in the surface estate or the mineral estate should be made in light of the use of the surface estate that Congress contemplated." ... Under the Taylor Act the existing or expected surface use by the patentee could be anything, and no element of Congressional intent or expectation existed.

*Id.* We similarly conclude Congress did not preordain Mr. Brown's surface or

mandated the reservation of minerals to the Osage Tribe).

subsurface use of lands exchanged under the Indian Reorganization Act.  For these reasons, we hold that the district court erred in relying on *Western Nuclear* in determining, as a matter of law, that gravel is a "mineral" for the purpose of the patent reservation at issue and therefore, quieting title to the gravel in the government.[7]

Having determined the district court applied the wrong legal precedent where, as here, the relevant statute provides no evidence of congressional intent, we next examine the scope of evidence relevant to determining the meaning of "all minerals" used in the exchange patent.

Before examining the evidence useful in construing the mineral reservation at issue, we address a threshold issue.  The district court cursorily stated that

---

[7] In so holding, we reject the government's unsupported argument that gravel must somehow be a "mineral" under the exchange patent because an "exchange of equal value," must mean the reservation interests exchanged in 1948 were equal or identical.  In other words, the government contends the mineral interest Mr. Brown held under the Stock-Grazing Homestead Act in his original homestead must be identical to the mineral interest exchanged under the Indian Reorganization Act.  As previously indicated, the Secretary of the Interior retained complete discretion to determine whether and what mineral interest would be exchanged so long as the overall exchange was of equal value.  Thus, it is not readily evident, without considering the parties' intent and the circumstances thereto, what was meant by inclusion of the word "mineral" in the exchange patent.

-18-

federal, and not state law, applies in this case in determining whether gravel is a "mineral." The district court based its conclusion on the Supreme Court's holding in *Wilson v. Omaha Indian Tribe*, 442 U.S. 653 (1979). We agree federal law applies under the principles articulated in *Wilson,* given the government never relinquished the mineral interest under which this dispute arises. *Id.* at 670-71.

In the circumstances of the present case, however, we agree with the Hess family that the decision to apply federal law does not conclude the inquiry. Instead, we must decide whether, like *Wilson*, this is a case in which the content of federal law should be determined by incorporation of state law. The Court in *Wilson* explained that

> "controversies ... governed by federal law do not inevitably require resort to uniform federal rules.... Whether to adopt state law or to fashion a nationwide federal rule is a matter of judicial policy 'dependent upon a variety of considerations always relevant to the nature of the specific governmental interests and to the effects upon them of applying state law.'" *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 727-28 (1979), quoting *United States v. Standard Oil Co.*, 332 U.S. 301, 310 (1947).

*Wilson*, 442 U.S. at 671-72.

In deciding this question, the Court went on, "we should consider whether there is need for a nationally uniform body of law to apply in situations comparable to this, whether application of state law would frustrate federal policy

-19-

or functions, and the impact a federal rule might have on existing relationships under state law." *Id.* at 672-73. Elsewhere, the Court has noted that "even assuming in general terms the appropriateness of 'borrowing' state law, specific aberrant or hostile state rules do not provide appropriate standards for federal law." *United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 595-96 (1973).

We believe the application of these principles in this case also is guided by the discussion in *Wilson*. In that case, the Court found little need for a uniform national rule, concluding instead that there was no strong reason for deciding federal interests under different property rules than those applied to private property holders in the same area. *Id.* at 673. Although this approach might lead to different results in different states, the Court saw in this prospect "little likelihood of injury to federal trust responsibilities or to tribal possessory interests." *Id.* Perhaps most importantly, the Court held that the controversy in *Wilson* was one in which the state interest in application of its own law was "substantial." *Id.* at 674.

Although the instant case involves aspects of property law different from those presented in *Wilson*, the state's interest in uniform rules of property seems to us to be the same. We are also unaware of any relevant state law that is

aberrant or hostile to federal interests. Seeing no compelling need for the development of a federal common law concerning the construction of reservations of mineral rights in instruments effecting land exchanges, we conclude that here, as in *Wilson*, the content of federal law should be determined by reference to state law. On remand, the district court should examine Colorado law and from it identify the governing rules for decision of the case.

## B. Interpretation of the Reservation

We turn to the hearing of evidence on the issue of interpretation of the reservation before us. In *Poverty Flats,* we examined extraneous evidence to reveal the parties' intent, including the circumstances surrounding the reservation at issue. 788 F.2d at 679-83. We did so because "minerals" is a general word susceptible to different meanings. *Cf. Bumpus v. United States*, 325 F.2d 264, 266 (10th Cir. 1963). In this case, like *Poverty Flats*, the meaning of "minerals" used in the exchange patent is not clear. In order to ascertain its meaning, we must, as in *Poverty Flats*, look at the intent of the parties as to the meaning of the word "minerals," as used in the exchange patent at issue. *Id.*; *cf. Bumpus*, 325 F.2d at 266. In determining the parties' intent, we may, as in *Poverty Flats*, examine extrinsic evidence, including the language of the instrument in which the word "mineral" occurs, the relative position of the interested parties, and the

-21-

substance of the transaction. *Poverty Flats*, 788 F.2d at 679-83; *Bumpus*, 325 F.2d at 266. Because the district court did not review such evidence in granting summary judgment to the government, we feel compelled to remand this case for further proceedings. In so doing, we note that where interpretation of a contract requires examination of extrinsic evidence to determine intent, and where more than one inference may be drawn therefrom, a question of fact is presented. *United States v. 1,253.14 Acres*, 455 F.2d 1177, 1180 (10th Cir. 1972) (citing *Carlock v. National Co-op. Refinery Ass'n*, 424 F.2d 148, 151 (10th Cir. 1970)). Thus, we leave to the district court the examination of the extrinsic evidence involved in this case and the resolution of any questions of fact presented. Because of the lapse in time since Mr. Brown's land exchange and lack of direct evidence on the parties' intent, we encourage the district court to look at the circumstances and conditions surrounding the exchange, including any records, documents and acts of the parties relevant in determining intent. *See Downstate Stone Co. v. United States*, 712 F.2d 1215, 1217 (7th Cir. 1983). In determining Mr. Brown's and the Secretary of Interior's and his agents' intent, the circumstances in this case may warrant examination as to the common occurrence and value of gravel at the time the instrument was executed, *see Poverty Flats*, 788 F.2d at 682-83, as well as the known and intended consequences, if any, in disturbing the land's surface to extract the gravel *id.* at 681; *see also Bumpus*, 325

F.2d at 267. For the foregoing reasons, we direct the district court to make a further inquiry into whether "gravel" is a "mineral" included in the reservation of the exchange patent, which in turn will resolve which party has title thereto.[8]

## C. Trespass Action

In addition to its quiet title action, the government also seeks monetary damages related to its trespass claim against the Hess family. In light of our remand on the issue of title to the gravel, we discuss this point in the event the district court may decide the title issue in favor of the government, making the limitations issue germane. In reviewing this claim, the district court determined that under 28 U.S.C. § 2415(b), the limitation period for bringing a trespass action ran for six years and ninety days after the action accrued. In determining when the action accrued, the district court concluded the government reasonably could have known of the Hess family's excavation and sale of the gravel at the time Alton Hess placed advertisements in the yellow pages of the local telephone directory, erected the large business sign clearly visible from the highway, and made certain sales public. While the district court determined the statute of limitations applied, it nevertheless concluded, without any analysis, that the

---

[8] We note no statute of limitation bars the government from bringing an action to establish title to the gravel at issue. *See* 28 U.S.C. § 2415(c).

action was not barred "altogether," and that an action existed for the six years and ninety days before the government filed its complaint on July 28, 1995. Accordingly, the district court awarded the government trespass damages for all gravel sales after April 29, 1989.

In an effort to provide some analysis supporting the district court's damage award, the government suggests the district court viewed each distinct gravel sale as an individual trespass and thus, a new cause of action arose with each individual act. However, it is the government's position the district court erred by not finding that these series of trespasses comprise a "continuing wrong." Under the "continuing wrong" doctrine, the government asserts it should be entitled to damages dating from the first commercial gravel transaction on the Hess Property, and not limited to damages since 1989. In support, the government relies on *Tiberi v. CIGNA Corp.*, 89 F.3d 1423, 1430-31 (10th Cir. 1996), where we recognized the "continuing wrong" doctrine in a statute of limitations case. In contrast, the Hess family argues the district court erred in failing to determine the government's claim for trespass is completely barred by the statute of limitation.[9]

_____

[9] Because it began extracting gravel for commercial use in 1980, the Hess family suggests the government's action is barred because its claim accrued prior to May 30, 1989, which is six years and ninety days prior to the date of service of

-24-

We review *de novo* the construction and applicability of a federal statute of limitation. *United States v. Telluride Co.*, 146 F.3d 1241, 1244 (10th Cir. 1998). We begin by examining the statutes at issue – the statute of limitation, 28 U.S.C. § 2415(b), and the tolling statute, 28 U.S.C. § 2416(c). In interpreting these statutes, we begin with their language, and if that language is clear, we give effect to its meaning. *Phillips Petroleum Co. v. Lujan*, 4 F.3d 858, 861 (10th Cir. 1993) (citing *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989)). "The best evidence of Congressional intent is the text of the statute itself and where the language is unambiguous, our inquiry is complete." *Phillips Petroleum*, 4 F.3d at 861. We must give statutes of limitation which bar the government's rights, like those at issue here, a strict construction in the government's favor. *Foutz v. United States*, 72 F.3d 802, 806 (10th Cir. 1995).

Under 28 U.S.C. § 2415(b), an action by the United States for money damages resulting from a tort "shall be barred unless the complaint is filed within three years after the right of action first accrues," provided that "an action to recover damages resulting from a trespass on lands of the United States ... on behalf of a recognized tribe, band or group of American Indians, ... may be

_____

the complaint.

brought within six years and ninety days after the right of action accrues." Thus, the language of § 2415 is plain and unambiguous, providing a six-year and ninety-day limitation period from the date a trespass action accrues. In determining when an action accrues under § 2415, we have explained:

> Generally, "a cause of action 'accrues' when 'it comes into existence." .... In other words, "[u]nder federal law governing statutes of limitations, a cause of action accrues when all events necessary to state a claim have occurred.'"

*Phillips*, 4 F.3d at 861(interpreting § 2415(a)) (internal quotations and citations omitted).


For the purpose of computing the limitation period, we also have determined certain exclusions apply which toll the limitation period. *Id.* at 861 (relying on 28 U.S.C. § 2416(c)). Excluded from the limitation period is the time during which "facts material to the right of action are not known and reasonably could not be known by an official of the United States charged with the responsibility to act in the circumstances." 28 U.S.C. § 2416(c). In *Phillips*, we stated the language of this section is subject to only one reasonable interpretation: the limitation period "is tolled until such time as the government could reasonably have known about a fact material to its right of action." 4 F.3d at 861-62. We further concluded the "'reasonableness' requirement expressly set forth under § 2416(c) is a complex factual determination to be made by the district court."

-26-

*Id.* at 863.

In this case, the district court found that government officials could not have reasonably known about the Hess family's gravel extraction until Alton Hess erected his highly visible business sign advertising gravel sales in 1984, or placed advertisements in the yellow pages of the Southwest Colorado telephone directory starting in 1985.[10] In so finding, the district court did not err in determining that the statute of limitations tolled until the time the government could have reasonably known of the extraction, which occurred no later than 1985. *Phillips*, 4 F.3d at 861-63.

The district court then, without further explanation, determined that an action existed for the six years and ninety days before the government filed its complaint on July 28, 1995, and granted damages to the government for trespass for all gravel sales after April 29, 1989. In so doing, the district court implicitly

---

[10] We agree with this finding, which is supported further by the fact the Hess pit is also clearly visible from numerous locations on the Southern Ute Tribal lands and Alton Hess over the years has distributed numerous brochures advertising his business and placed numerous advertisements in the Durango Herald offering gravel for sale.

determined these gravel sales constituted a continuing trespass.[11]  While we prefer

explicit rulings, we agree that if the gravel is titled in the government, the Hess

family's gravel extractions over the years constitute a continuing trespass.[12]


Claiming this case involves a continuing trespass, the government suggests

that under *Tiberi* and the "continuing wrong" doctrine it can recover damages as

far back as the Hess family's first commercial gravel transaction.  In *Tiberi*, we

applied the "continuing wrong" doctrine to facts supporting a series of fraudulent

---

[11]  Only in continuing trespass cases is the statute of limitations period
calculated back from the date of filing the complaint, *see* discussion *infra*, thereby
leading us to conclude the district court implicitly determined the gravel sales
constituted a continuing trespass.

[12]  The crucial question in regard to the applicability of the statute of
limitations for trespass is whether the injuries sustained are permanent (fixed) or
continuing (sometimes referred to as "temporary").  *See Miller v. Cudahy*, 858
F.2d 1449, 1453 (10th Cir. 1988), *cert. denied*, 492 U.S. 926 (1989); *see also* 1
Am. Jur. 2d *Adjoining Landowners* § 126 (1994); 75 Am. Jur. 2d *Trespass* §§ 201,
203 (1991).  The circumstances of this case, including the continuing series of
gravel extractions and sales, along with a review of the various distinctions
between permanent and continuing trespass, lead us to conclude the Hess family's
gravel extraction constitutes a continuing trespass.  *See generally* 51 Am. Jur. 2d
*Limitation of Actions* § 121 (1970); 75 Am. Jur. 2d *Trespass* §§ 2, 114 (1991);
*accord Archer v. Greenville Sand & Gravel Co.*, 233 U.S. 60, 65 (1914)
(concluding dredging of sand on river bed is a continuing trespass); *Thompson v.
United States*, 308 F.2d 628, 633 (9th Cir. 1962) (holding, without analysis, that
removal of minerals is a continuing trespass); *Moore v. Rotello*, 719 S.W.2d 372,
378 (Tex. Ct. App. 1986) (determining removal of gravel from railroad's right-of-
way constitutes a continuing trespass).

torts, stating that "where a tort involves a continuing or repeated injury, the cause of action accrues at, and limitations begin to run from, the date of the last injury." *Tiberi,* 89 F.3d at 1430 (quotation marks and citation omitted). In so holding, we stated "'the statute of limitations does not begin to run until the wrong is over and done with,'" *id.* (quoting *Taylor v. Meirick,* 712 F.2d 1112, 1118 (7th Cir. 1983)), which, if applied in this case, would lend support to the government's argument. However, both *Tiberi* and *Meirick* involved inculpatory parties who fraudulently concealed their conduct so the plaintiffs were prevented from timely coming forward to seek redress. *Tiberi,* 89 F.3d at 1431; *Meirick,* 712 F.2d at 1118-19. An examination of these cases leads us to conclude they are inapplicable to the circumstances in this case.[13]

First, in this case, the Hess family made no attempt to conceal their gravel extractions and sales. Moreover, the concept of "continuing trespass" developed apart from, and follows slightly different legal principles than, the "continuing

---

[13] In *Tiberi,* we acknowledged that the "continuing wrong" doctrine "cannot be employed where the plaintiff's injury is 'definite and discoverable, and nothing prevented the plaintiff from coming forward to seek redress.'" *Tiberi,* 89 F.3d at 1431 (quoting *Wilson v. Giesen,* 956 F.2d 738, 743 (7th Cir. 1992)). Thus, under *Tiberi,* the "continuing wrong" doctrine described by the government cannot apply given the district court's finding that the government should have reasonably known of the Hess family's gravel extraction.

wrong" doctrine applied in fraudulent concealment cases like *Tiberi*. In trespass cases, where the statute of limitations has expired with respect to the original trespass, but the trespass is continuing, we and other courts have calculated the limitation period back from the time the complaint was filed,[14] rather than forward from the date of the original trespass, or where applicable, back to the reasonable discovery date. *See, e.g.*, *Nieman v. NLO, Inc.*, 108 F.3d 1546, 1559-60 (6th Cir. 1997) (affirming concept that recovery for continuing trespass damages includes only those damages incurred within the statute of limitation period prior to filing the lawsuit); *Tucker v. Southern Wood Piedmont Co.*, 28 F.3d 1089, 1092 (11th Cir. 1994) (same); *Miller*, 858 F.2d at 1456 (same).[15]

In light of these cases and the well-established method of applying the statute of limitations back from the filing of the complaint in continuing trespass actions, we cannot agree with the Hess family that the government's action is

---

[14] *See also* 1 Am. Jur. 2d *Adjoining Landowners* § 126 (1994); 51 Am. Jur. 2d *Limitations of Actions* § 121 (1970); 75 Am. Jur. 2d *Trespass* §§ 2, 26, 201, 203 (1991).

[15] In applying the six-year limitation under 28 U.S.C. § 2415(b), the Ninth Circuit, in a case similar to the one here, limited the government's continuing trespass damages to only those damages occurring six years prior to commencement of its action. *United States v. Rice*, 886 F.2d 334, 1989 WL 112460 at *8 (9th Cir. Sept. 15, 1989) (unpublished opinion).

totally barred, or with the government that it is entitled to damages commencing with the Hess family's first commercial gravel sale in 1980. Rather, on remand, damages for the Hess family's continuing trespass, if any, should be computed six years and ninety days from the filing of the complaint, or April 29, 1989. Applying the statute of limitations in this manner comports with the competing interests of affording the statutes at issue a strict construction in the government's favor, *Foutz*, 72 F.3d at 806, while recognizing Congress' effort to encourage prompt agency action on trespass claims by barring those claims the government delays in bringing.[16] *See Phillips*, 4 F.3d at 863.

For these reasons, we agree with the district court's determination that the government is not barred from seeking trespass damages. However, in light of our remand on the issue of quieting title to the gravel, we must vacate and remand the district court's award of monetary damages to the government pending a determination of that issue.

D. The Estoppel Claim

---

[16] In this case, because the government did not act diligently in bringing its trespass claim, the limitation period bars it from recovering damages for the four year period from the date of reasonable discovery in 1985 to April 29, 1989.

In their opening brief, the Hess family argues that the equitable doctrine of estoppel bars the United States from revising its position and asserting a claim to gravel deposits fifty years after issuing a patent to Brown. More specifically, the Hess family says that a changed BIA policy was initiated by a memorandum to all area directors in September 1990; that the memorandum acknowledged that the BIA was "aware of the confusion that now exists in the status of sand and gravel"; that the prospective 1990 change of BIA procedures cannot affect the stability of title vested fifty years earlier by the Brown Patent; and that equity principles require that the BIA's attempt to retroactively apply its 1990 change of policy be barred by estoppel.

That theory of equitable estoppel should be considered on remand by the district court in determining the viability of the gravel claim of the Hess family under federal law with its incorporation of state law principles as explained earlier. The district judge should consider the estoppel claim in light of the limitations on estoppel against the government reviewed in *Penny v. Guiffrida*, 897 F.2d 1543, 1546-49 (10th Cir. 1990), and the Supreme Court precedents there surveyed.

Accordingly, the district court's summary judgment in favor of the United

States in its action to quiet title the ownership of the gravel at issue is

**VACATED** and the case **REMANDED** for further proceedings consistent with

this opinion.  For the reasons stated, the district court's decision awarding

trespass damages to the United States is also **VACATED** and **REMANDED**.