**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 12 2003**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA, on its own behalf and on behalf of the Southern Ute Indian Tribe,

      Plaintiff-Counter-Defendant-Appellee,

v.

LULU MAE HESS; LOYD HESS; ALTON HESS; LLH DEVELOPMENT CORPORATION,

      Defendants-Counter-Claimants-Appellants.

No. 02-1212

COLORADO ROCK PRODUCTS ASSOCIATION; NATIONAL STONE, SAND & GRAVEL ASSOCIATION; SOUTHERN UTE INDIAN TRIBE,

      Amici Curiae.

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. No. 95-Z-1894)**

G.R. Miller, of McDaniel, Baty, Miller, Agro & Downs, LLC, Durango, Colorado, for the defendants-counter-claimants-appellants.

Elizabeth Ann Peterson, of The Department of Justice, Environment and Natural Resources Division, Washington, D.C. (Thomas L. Sansonetti, Assistant Attorney

General; John W. Suthers, United States Attorney; Michael E. Hegarty, Assistant United States Attorney; William B. Lazarus and Ellen J. Durkee, Department of Justice, Environment and Natural Resources Division, Washington, D.C.; and Janet Spaulding, Office of the Regional Solicitor, Albuquerque, New Mexico, with her on the brief), for the plaintiff-counter-defendant-appellee.

Arthur Lazarus, Jr., of Sonosky, Chambers, Sachse, Endreson & Perry, Washington, D.C. (Sam W. Maynes, of Maynes, Bradford, Shipps & Sheftel, LLP, Durango, Colorado, with him on the brief), for the amicus curiae Southern Ute Indian Tribe.

Christopher G. Hayes and Darin B. Scheer, of Bjork, Lindley, Danielson & Little, P.C., Denver, Colorado, on the brief for amici curiae Colorado Rock Products Association and National Stone, Sand & Gravel Association.

—————————————

Before **TACHA**, Chief Judge, **ANDERSON** and **BRISCOE,** Circuit Judges.

—————————————

**BRISCOE**, Circuit Judge.

—————————————

This appeal requires us to again address whether gravel on property owned by appellants Lulu Mae Hess, Loyd Hess, Alton Hess, and LLH Development Corporation (the Hess family) comes within the United States' general reservation of ownership of "all minerals" on that property. On remand from our ruling in United States v. Hess, 194 F.3d 1164 (10th Cir. 1999) (Hess I), the district court granted summary judgment in favor of the United States. We exercise jurisdiction under 28 U.S.C. § 1291 and reverse and remand with directions to enter judgment for the Hess family.

**I.**

In Hess I, this court set forth the historical background of the mineral reservation now at issue:

In 1868, the government set aside almost sixteen million acres as an Indian reservation for the Confederated Bands of Utes. Under the Act of 1880, the Southern Ute Indian Tribe ceded their portion of the reservation to the United States in exchange for cash payments and allotment of land along the La Plata River to individual Tribe members. The purpose of the Act was to dismantle the Ute reservation, and thereby destroy the tribal structure, change the Utes' nomadic ways, and convert them from a pastoral to an agricultural people. The government in turn sold the ceded reservation land for cash, set portions aside for public purposes, or disposed of it as free homesteads under various public land and homestead acts. One of the last homestead acts Congress passed for the purpose of opening ceded, non-allotted lands to public entry and settlement was the Stock-Raising Homestead Act of 1916. This Act provided for the settlement of homesteads on lands where the surface was deemed "chiefly valuable for grazing and raising forage crops," and reserved to the United States "all the coal and other minerals" in lands patented under the Act.

In the 1930s, the government initiated a marked shift in Indian policy from allotment and assimilation which deemphasized tribal existence . . . to a revival of tribalism. This self-determination policy culminated in the Indian Reorganization Act of 1934 which authorized the Secretary of the Interior to restore tribal ownership in the remaining surplus lands of any Indian reservation. As a result of this and other acts of Congress, the Southern Ute Tribe's reservation became a checkerboard of different types of ownership interests. . . . In order to remedy this "checkerboarding" and effectuate land consolidations between Indians and non-Indians within the reservation, Congress included a provision in the Indian Reorganization Act authorizing the Secretary of the Interior to acquire, through purchase, exchange or relinquishment, any interest in lands within the reservation for the benefit of the Indian tribes. The Act's only relevant condition concerning exchanges involved a requirement that the lands exchanged be of "equal value." 25 U.S.C. § 463e.

Id. at 1166-67 (internal citations and quotations omitted).

In 1935, pursuant to the Stock-Raising Homestead Act, Arvil Brown, the father of Lulu Mae Hess, received a United States land patent to 640 acres in La Plata County, Colorado. The patent expressly reserved to the United States "coal and other minerals."

3

Id. at 1167. In 1941, in an effort to consolidate Southern Ute Tribe lands into manageable, contiguous tracts, the Bureau of Indian Affairs (BIA) began several years of negotiations with Brown to exchange his 640-acre tract for a 440-acre tract held by the BIA in trust for the Tribe. In 1945, as part of the negotiations, an appraiser valued both properties at $770 and assigned no value to the properties' oil, gas, and mineral rights, leaving that portion of the appraisal blank. In 1946, the Ute Tribal Council formally agreed to the exchange. After it was learned that Brown did not own the mineral rights to his homestead, the following reservation was added to the government's offer to convey its 440-acre tract: "That all oil and gas, coal and other minerals are reserved for the Southern Ute Tribe." Aplt. App. at 397. In July 1946, Brown deeded his 640-acre homestead to the government. On October 6, 1948, the government issued an exchange patent to Brown for its 440-acre tract "subject to the reservation of all minerals in and to the land, including oil and gas, to the United States for the use and benefit of the Southern Ute Tribe." Hess I, 194 F.3d at 1168.

In 1963, Lulu Hess, and her husband, Loyd Hess, purchased the 440-acre tract from Brown. Nearly all of the Hess family property is underlain with commercial quality "Animas" gravel and noncommercial quality "Florida" gravel. In 1968, the Hess family began extracting Animas gravel from their property. From 1983 to 1996, they "removed approximately 147,619 cubic yards of Animas gravel from the Hess pit for the Hess family's use, for small individual sales to local ranchers for private road use, and for sale

4

to the Colorado Department of Transportation for use on roads apparently located near the Hess property." Hess I, 194 F.3d at 1169. In 1993, the La Plata County Board of Commissioners recommended approval of the Hess family's plan to sell 53 acres of their property as individual residential lots, which acreage was underlain with Animas gravel. However, because the Southern Ute Indian Tribe and the BIA objected to the proposed development based on the Tribe's mineral interest in the land, the Board has not approved the proposed subdivision.

In 1995, the United States, on behalf of the Tribe, filed suit against the Hess family asking the district court to: (1) declare the gravel located on the Hess property a "mineral" within the terms of the mineral reservation in the exchange patent; (2) quiet title to the gravel in the name of the United States as trustee for the Tribe; (3) enjoin further mining by the Hess family; and (4) award monetary relief for trespass damages caused by the Hess family's past mining activity. The Hess family counterclaimed to quiet title to the gravel deposits and the parties filed cross-motions for summary judgment. The district court declined to consider evidence of the intent of the parties involved in the exchange patent and denied the Hess family's motion for summary judgment, holding: (1) federal law, not state law, controlled construction of the exchange patent, and (2) as a matter of law, the mineral reservation contained in the exchange patent reserved gravel to the United States for the benefit of the Tribe. After a trial on the remaining issues, the district court awarded the United States a monetary judgment and the Hess family appealed.

In Hess I, this court disagreed with the district court's reliance on Watt v. Western Nuclear, Inc., 462 U.S. 36, 59-60 (1983) (holding that "gravel is a mineral reserved to the United States in lands patented under the [Stock-Raising Homestead Act]"). We distinguished Western Nuclear because the land at issue in that case was patented under the Stock-Raising Homestead Act whereas the Hess family property was patented under the Indian Reorganization Act of 1934. Hess I, 194 F.3d at 1171. We noted that "[t]hese Acts are very different with respect to their treatment of mineral reservations." Id. We further stated that although federal law applied, "the content of federal law should be determined by reference to state law." Id. at 1173. On remand, the district court was directed to "examine Colorado law and from it identify the governing rules for decision of the case." Id. Because "the meaning of 'minerals' used in the exchange patent [was] not clear," the district court was to "look at the intent of the parties as to the meaning of the word 'minerals,' as used in the exchange patent at issue." Id. at 1174. In determining the intent of the parties, we stated that the district court could look at extrinsic evidence, including an "examination as to the common occurrence and value of gravel at the time the instrument was executed, as well as the known and intended consequences, if any, in disturbing the land's surface to extract the gravel." Id. (internal citation omitted).

In June 2001, following our remand of the case in 1999, the United States disclaimed "any and all right, title and interest [it] may have or may have had in and to the [noncommercial quality] 'Florida' alluvial and colluvial gravels" on the Hess property.

Aplt. App. at 285. Thus, on remand, the district court only addressed ownership of the commercial quality Animas gravel and again found the gravel was a mineral reserved to the government under the mineral reservation.

**II.**

We review the district court's grant of summary judgment de novo, applying the same legal standard used by the district court. Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1326 (10th Cir. 1999). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When applying this standard, this court views the evidence and draws all reasonable inferences therefrom in the light most favorable to the nonmoving party. Simms, 165 F.3d at 1326.

*Burden of Persuasion and Production*

As a threshold matter, we must first determine which party bears the burden of persuasion and production in proving whether gravel was included in the reservation of "all minerals" in the 1948 land patent. By applying 25 U.S.C. § 194 and the general principle that land grants are construed in favor of the United States, the district court placed the burden on the Hess family and held that the Hess family did not shoulder its burden.

7

Section 194 provides:

> In all trials about the right of property in which an Indian may be a party on one side, and a white person on the other, the burden of proof shall rest upon the white person, whenever the Indian shall make out a presumption of title in himself from the fact of previous possession or ownership.

25 U.S.C. § 194. Under this section, "once the Tribe makes out a prima facie case of prior possession or title to the particular area under dispute," the non-Indian will shoulder the burden of persuasion and production. Wilson v. Omaha Indian Tribe, 442 U.S. 653, 668-69 (1979). The United States brought the present action on behalf of the Tribe, requesting that the district court declare the sand and gravel located on the Hess property a mineral, within the terms of the mineral reservation in the exchange patent. Consequently, under this statutory language, the district court found that the Tribe was plainly an "Indian"[1] and the Hess family should be classified as a "white person." See id. at 664-66.

The Hess family argues the section does not apply because when the government issued the exchange patent in 1948, the Tribe's title to the land was extinguished. We disagree. Under § 194, the burden of persuasion arises "whenever the Indian shall make out a presumption of title in himself from the fact of *previous* possession or ownership." 25 U.S.C. § 194 (emphasis added). Hence, the United States, acting on the Tribe's

---

[1] The Supreme Court has held that the term "Indian" in § 194 includes within its ambit "Indian tribes." See Wilson, 442 U.S. at 664-66.

behalf, needs only to make a prima facie showing that the Tribe had previous possession of the land to place the burden of proof on the Hess family. See Wilson, 442 U.S. at 668-69 (finding showing that land was once occupied by tribe as a reservation was sufficient to constitute prima facie showing to raise a § 194 presumption). In this case, as the history of the Hess property makes clear, the government held the Hess family's 440-acre property in trust, on the Tribe's behalf, before issuing the exchange patent to Brown for his 640-acre La Plata property. We conclude the Tribe had "previous possession" and that the district court was correct in placing the burden on the Hess family.

The Hess family also argues that the district court improperly applied the general principle that "[l]and grants are construed favorably to the United States government, and nothing passes except what is conveyed in clear and explicit language." Am. Water Dev., Inc. v. City of Alamosa, 874 P.2d 352, 365 (Colo. 1994) (en banc) (citing Western Nuclear, 462 U.S. at 59). We agree with the Hess family on this point. As we stated in Hess I, "[t]his case involves an 'exchange' patent issued pursuant to the Indian Reorganization Act, and not a 'land grant' patent issued under the Stock-Raising Homestead Act." 194 F.3d at 1171. A land grant is "[a] donation of public land to an individual, a corporation, or a subordinate government." Black's Law Dictionary (7th ed. 1999). In this instance, it is clear the government did not donate the land to Brown. Rather, Brown and the government exchanged properties after approximately seven years of negotiations. Accordingly, we conclude the district court erred in applying the

presumption applicable to land grants.

*Interpretation of Mineral Reservation under Colorado Law*

We turn to the central issue of this appeal -- whether the district court erred in interpreting the language of the general mineral reservation to include rights to the gravel on the Hess property. The Hess family contends the court (1) erred in its application of Colorado law, (2) made several factual errors, and (3) failed to follow this court's instructions on remand.

In Hess I, we addressed the relationship between state and federal law and concluded that the district court had neglected to consider Colorado law in deciding whether "all minerals," as used in the exchange patent, included gravel. We concluded that, because the government never relinquished the mineral interest which gave rise to this property dispute, federal law controlled the outcome in this case. Hess I, 194 F.3d at 1173. We next addressed the content of that federal law. Relying substantially on Wilson, we explained:

> [W]e agree with the Hess family that the decision to apply federal law does not conclude the inquiry. Instead, we must decide whether, like Wilson, this is a case in which the content of federal law should be determined by incorporation of state law. The Court in Wilson explained that
> > "controversies . . . governed by federal law do not inevitably require resort to uniform federal rules . . . Whether to adopt state law or to fashion a nationwide federal rule is a matter of judicial policy dependent upon a variety of considerations always relevant to the nature of the specific governmental interests and to the effects upon them of applying state law. . . ."
> Wilson, 442 U.S. at 671-72.
> > In deciding this question, the Court went on, "we should consider

10

> whether there is need for a nationally uniform body of law to apply in situations comparable to this, whether application of state law would frustrate federal policy or functions, and the impact a federal rule might have on existing relationships under state law." Id. at 672-73. Elsewhere, the Court has noted that "even assuming in general terms the appropriateness of 'borrowing' state law, specific aberrant or hostile state rules do not provide appropriate standards for federal law." United States v. Little Lake Misere Land Co., 412 U.S. 580, 595-96 (1973).
>
> We believe the application of these principles in this case also is guided by the discussion in Wilson . . .
>
> Although the instant case involves aspects of property law different from those presented in Wilson, the state's interest in uniform rules of property seems to us to be the same. We are also unaware of any relevant state law that is aberrant or hostile to federal interests. Seeing no compelling need for the development of a federal common law concerning the construction of reservations of mineral rights in instruments effecting land exchanges, we conclude that here, as in Wilson, the content of federal law should be determined by reference to state law. *On remand, the district court should examine Colorado law and from it identify the governing rules for decision of the case.*

Hess I, 194 F.3d at 1173 (emphasis added).

In light of this court's instructions, we consider whether the district court failed to identify the governing rules for decision. We note that, arguably, Hess I already addressed this issue insofar as we directed the district court to "*examine Colorado law and from it* identify the governing rules for decision of the case." Hess I, 194 F.3d at 1173 (emphasis added). In response to this direction, the district court determined that because Colorado law yielded an outcome that was not in the federal government's interests, Colorado law was itself hostile to the federal government's interests. In further support of its conclusion that applicable Colorado law was hostile to federal interests, the court stated application of Colorado law would shift the burden of proof to the

11

government contrary to the mandate of § 194.[2]

Colorado courts have directly addressed whether a reservation of mineral rights implicitly includes a reservation of gravel on two occasions. In Farrell v. Sayre, 270 P.2d 190 (Colo. 1954) (en banc), the Colorado Supreme Court considered a 1941 deed that contained a general mineral reservation. The issue was whether the grantor of the surface estate had preserved his right to the gravel under the reservation. The surface of the land consisted entirely of sand and gravel and, at the time of the deed, the gravel had no commercial value. In holding that the reservation did not include gravel, the court stated:

> It seems to be the general rule that where the surface of land is sand and gravel, a straight mineral reservation does not include the sand and gravel, and where a similar situation has arisen, the cases turn upon the intent of the parties at the time of the execution of the deed containing the reservation, when such reservation is in general terms, and virtually every decision is to the effect that where the grant in the deed, as here, is nothing but sand and

---

[2] Specifically, the district court wrote:
The Little Lake Court held that the "retroactive application" of Louisiana law which "deprives [the United States] of its bargained-for contractual interests" was "plainly hostile to the interests of the United States." 412 U.S. at 597. Likewise, here, the retroactive application of the 1954 Farrell decision – if accorded defendants' interpretation – to a 1948 land transaction would deprive the United States, on behalf of the Southern Ute Indian Tribe, of a reservation of commercially valuable gravel rights. Under the standard of Little Lake, the United States' interest in carrying out its trust responsibilities for the Tribe is the sort of "specific governmental interest" that state law would impermissibly adversely impact. Furthermore, as noted above, defendants carry the burden of proof in this case. 25 U.S.C. § 194. If Colorado law is given the interpretation argued by defendants, then such law shifts the burden of proof to the plaintiff. Such interpretation of Colorado law would be hostile to federal interests.
Aplt. App. at 327.

gravel, it surely was not contemplated that the parties intended to nullify the grant without some direct specification in the reservation.

Id. at 192. Thus, the court concluded that in cases involving surface gravel, a general mineral reservation clearly, as a matter of law, could not be said to include the gravel.

In Morrison v. Socolofsky, 600 P.2d 121 (Colo. Ct. App. 1979), the Colorado Court of Appeals considered whether a deed reserving "oil, gas and other minerals" operated to reserve gravel where the entire surface of the property was underlain with gravel. The evidence showed that removal of the gravel would destroy the surface. The court opined that, because "[t]he reservation of 'all minerals' is inherently ambiguous," id. at 122, it must determine "'what that word means in the vernacular of the mining world, the commercial world and landowners at the time of the grant, and whether the particular substance was so regarded as a mineral.'" Id. (quoting Farrell, 270 P.2d at 193). Following the reasoning of Farrell, the court concluded that the mineral reservation did not reserve gravel:

> Though in Farrell . . . the sand and gravel constituted the entire surface of the land, we find no distinction which would dictate a different result here, where the gravel underlies the topsoil of the entire property. Defendants' construction of the reservation could result in the destruction of the land surface and strip away its agricultural usefulness.

Id. at 123. Morrison can thus be said to extend the rule of Farrell in cases where removal of the underlying gravel would destroy the usefulness of the land's surface. See Burkey v. United States, 25 Cl. Ct. 566, 578 (1992) ("Normally, gravel is not treated as a mineral within the meaning of a general reservation of minerals clause") (applying Colorado

13

law).[3]

On remand from our ruling in Hess I, the district court examined Farrell and Morrison. The court concluded that Farrell only applied to instances where "the entire surface area conveyed is nothing but sand and gravel." Aplt. App. at 325.[4] Because the gravel on the Hess property was not on the surface, the court refused to follow Farrell because it was "distinguishable in ways which are dispositive." Id. at 316. The district court also construed the Supreme Court's decision in United States v. Little Lake Misere Land Co., 412 U.S. 580, 595-96 (1973), to mean that *any* analysis that applied state law so as to construe a contract to the United States' detriment, created an outcome that was "plainly hostile to the interests of the United States." Id. at 327. Because applying Farrell

---

[3] As the court noted in Burkey,

> Decisions of other courts are overwhelmingly to the same effect. W.S. Newell, Inc. v. Randall, [373 So. 2d 1068, 1069 (Ala. 1979)]; Harper v. Talladega County, [185 So. 2d 388, 390 (Ala. 1966)]; Fisher v. Keweenaw Land Ass'n, [124 N.W.2d 784, 788 (Mich. 1963)]; Hovden v. Lind, 301 N.W.2d 374, 378 (N.D. 1981); Holland v. Dolese Co., 540 P.2d 549, 550 (Okla. 1975); Heinatz v. Allen, [217 S.W.2d 994, 997 (Tex. 1949)]; Winsett v. Watson, 206 S.W.2d 656, 658 (Tex. Civ. App. 1947); see also Bambauer v. Menjoulet, [29 Cal. Rptr. 874, 876 (Dist. Ct. App. 1963)]; Holloway Gravel Co. v. McKowen, [9 So. 2d 228, 232 (La. 1942)]. See generally 54 Am. Jur. 2d Mines & Minerals § 8 (1971); A.G. Barrett, Annotation, Clay, Sand, or Gravel as "Minerals" Within Deed, Lease, or License, 95 A.L.R. 2d 843 (1964); 58 C.J.S. Mines & Minerals § 155 (1948).

25 Cl. Ct. at 575-576.

[4] In the case of the Hess family property, the court found, "[v]ery little of the surface area of this property is sand and gravel," and, as such, the government's interpretation of the reservation "to include only commercially valuable gravel would not unduly disturb defendants' use of the surface rights." Aplt App. at 326.

14

and Morrison resulted in an outcome in this case that was detrimental to the United States' alleged contractual rights, the district court concluded that Little Lake Misere required it to reject state law.

We conclude that the district court erred in declining to apply Farrell and Morrison and that, consistent with Little Lake Misere, the court should have adopted Colorado law as the rule for decision. In Little Lake Misere, the Supreme Court did not create an absolute rule barring application of state law in cases where federal contractual interests might lose. Rather, the Court discussed a set of considerations courts should consider in determining whether, on balance, resort to state law is appropriate.

> [W]hether state law is to be applied is a question "of federal policy, affecting not merely the federal judicial establishment and the groundings of its action, but also the Government's legal interests and relations . . . And the answer to be given necessarily is dependent upon a variety of considerations always relevant to the nature of the specific governmental interests and to the effects upon them of applying state law."

Little Lake Misere, 412 U.S. at 595 (quoting United States v. Standard Oil Co., 332 U.S. 301, 309-10 (1947)). The Court went on to note that, "even assuming in general terms the appropriateness of 'borrowing' state law, specific aberrant or hostile state rules do not provide appropriate standards for federal law." Id. at 595-96.

In Wilson, the Supreme Court provided further guidance on this issue when it applied these principles in the context of considering whether a state rule should supply the federal rule for decision where applicable state law regarding avulsion and accretion had the effect of sometimes increasing land holdings of Indian tribes and at other times

15

reducing them.  The Court reasoned that, "as long as the applicable [state law] standard is applied evenhandedly to particular disputes," there was no "need to develop a general body of federal common law to decide cases such as this" where the United States had an interest in the outcome of what was, at bottom, a standard property dispute.  442 U.S. at 673.  Further, the Court noted, state real property law was an area

> in which the States have substantial interest in having their own law resolve controversies . . .  There is considerable merit in not having the reasonable expectations of these private landowners upset by the vagaries of being located adjacent to or across from Indian reservations or other property in which the United States has a substantial interest.  Borrowing state law will also avoid arriving at one answer . . . in disputes involving Indians on one side and possible quite different answers with respect to neighboring land where non-Indians are the disputants.

Id. at 674.  Thus, in Wilson, the Court applied state law to the detriment of Indian tribes.  The Court found it compelling that the state rule at issue did not specifically target federal contracts and that the states in general have a substantial interest in applying their own property law.

The mere fact that the United States will not prevail in the face of an otherwise neutral state rule for decision is not enough to establish that a rule is "hostile" to the federal government's interests.  To the contrary, where the state rule operates without particular favor or detriment to either the government or a private litigant, courts have looked favorably upon adopting that rule.  See, e.g., Burkey, 25 Cl. Ct. at 581 (citing Farrell and Morrison to hold the United States, as owner of surface estate, owned rights to underlying gravel because mineral reservation did not expressly include gravel); Board of

16

Comm'rs v. United States, 308 U.S. 343 (1939) (applying state law to claim by United States that political subdivision was improperly taxing Indian trust lands because there was no reason for beneficiaries of federal rights to have privileged position over other aggrieved taxpayers). Further, application of Colorado law does not negate § 194's requirement that the Hess family carry the burden of proof to establish that gravel was not included in the reservation of minerals in the 1948 land patent. Simply because the Hess family's task of proving ownership of the gravel is made easier by application of Colorado law does not mean that the Hess family does not continue to shoulder the burden of proof under § 194.

We conclude, consistent with Hess I, that this case is controlled by the two principles set forth in Farrell and Morrison. First, if a majority of the Hess family's property is underlain with gravel and such gravel cannot be mined without disturbing the property's surface, the general rule applies that a mineral reservation of all minerals does not include gravel. Second, that general rule can be overcome upon a finding that the parties to the contract nevertheless intended for the word "mineral," as used in the reservation, to include gravel.

Applying the first rule, we note the district court determined that (1) a majority of the property was *not* underlain with gravel, and (2) the gravel on the Hess family property *could* be mined without disturbing the property's surface. The Hess family argues these findings are not supported by the record. We agree.

17

Based on a personal visit to the property, the district court concluded that "perhaps over 95 percent" of the Hess family property was "located within a grass- and vegetation-covered green river valley, or on heavily sloping terrain." Aplt. App. at 320. Although gravel underlies most of this soil, the district court concluded the deposits were "of such poor quality as to be non-commercial . . . at any time." Id. The court failed to cite any portion of the record for this finding. In contrast, Mary Gillam, a geologist who studied the gravel deposits on the Hess property, concluded that "[n]early all of the Hess property is underlain by gravel deposits . . . The usable portions of the Hess property . . . consist almost entirely of surface or near-surface gravel deposits." Id. at 549. No government witness or expert examined the gravel deposits on the Hess property. To the contrary, both the district court and the United States acknowledged that gravel and sand are "everywhere" on the property, underlying "most of the soil in this region of the country." Id. at 43-45, 320.

The district court's conclusion that "[t]here is no evidence that any substantial portion of the surface of the . . . property would be disrupted" is also belied by the record. Id. at 327. The evidence showed that "[e]conomic volumes of gravel cannot be mined without disturbing and destroying the usefulness of large areas of the surface of the Hess property." Id. at 550. Indeed, in Hess I, this court stated that "[t]he parties generally agree the gravel located on the Hess property cannot be mined without disturbing or destroying the usefulness of the surface." 194 F.3d at 1169. We conclude the district

18

court's factual findings are not supported by the record.

We next address the second Colorado rule – the parties' intention when they drafted and agreed to the general mineral reservation. Again, our analysis is framed by this court's instruction in Hess I where we held that "the meaning of 'minerals' used in the exchange patent is not clear. In order to ascertain its meaning, we must . . . look at the intent of the parties" at the time of the exchange. Id. at 1174. We remanded the case to the district court and encouraged "the district court to look at the circumstances and conditions surrounding the exchange, including any records, documents and acts of the parties relevant in determining intent." Id. We further noted that "this case may warrant examination as to the common occurrence and value of gravel at the time the instrument was executed, . . . as well as the known and intended consequences, if any, in disturbing the land's surface to extract the gravel." Id. On remand, the district court looked at the extrinsic evidence and found that the parties clearly intended to include gravel in the mineral reservation. The Hess family argues the court erred in reaching this conclusion.

The district court found that when the 1948 deed exchange occurred, the government "considered commercially useful sand and gravel *to be a mineral of value*." Aplt. App. at 320-21 (emphasis added). However, neither the government nor the district court cited any evidence to support this assertion and we find the evidence in the record is to the contrary.

The Hess family introduced the affidavit of Lawrence Brewer, an engineer, who

19

studied the gravel resources on the Hess property. Brewer concluded that "[t]he Hess pit, and other deposits of Animas River Gravel located on the Hess Property, had no economic value in 1948, when the exchange patent was issued to Mr. Arvil Brown." Id. at 468. Further, Brewer opined that, at the time of the land exchange, the Hess property was "more valuable for grazing purposes than for extraction of gravel deposits located on it" because the "cost of extracting, processing and delivering gravel to the Durango market from the Hess pit in 1948 . . . substantially exceeded the delivered sales price." Id. at 468-69. This evidence that the gravel was not commercially valued and therefore could not be valued as such by the government is not refuted in the record.

The government's 1945 appraisal assigned *no* value to the property's oil, gas, and mineral rights. Instead, the appraisal characterized the property's entire value ($770) as "grazing." Id. at 836. Further, the detailed correspondence accompanying the appraisal supports the conclusion that the appraiser placed no additional value on the land beyond its grazing value. We also note that the government's failure to assign any value to the mineral rights occurred at a time when, according to the findings in Gillam's report, the presence of gravels on the Florida Mesa had been a matter of public knowledge since the first major study by the U.S. Geological Survey was published in 1932, and the BIA and the U.S. Geological Survey were aware of the gravels when the Hess family property was transferred to Brown in 1948. Accordingly, the record demonstrates that the government knew of the presence of gravel on the Hess family property, but assigned no value to it.

20

We find no support for the district court's finding that in 1948 the United States intended to reserve rights to the gravel because it was considered to be a commercially valuable mineral at that time.[5]

The district court relied heavily on the government's contention that the parties intended to include gravel under the reservation because the Indian Reorganization Act required lands exchanged to be of "equal value." 25 U.S.C. § 463e. The government argued that under <u>Western Nuclear</u>, the United States retained the gravel in the original Brown homestead because it was patented under the Stock-Raising Homestead Act. As such, Brown did not own the mineral rights in his own homestead. Thus, when the exchange of properties occurred, the United States placed a mineral reservation on the property transferred to Brown (which became the Hess family property) to ensure that Brown received no more than he gave and, as a result, to satisfy the Indian Reorganization Act's "equal value" requirement. In this respect, the district court and the United States concluded the two mineral reservations – the one on the Brown homestead which the United States received and the one attached to what is now the Hess family property which Brown received – "mirror one another." Thus, the Hess reservations merely "reserve[d] from the tribal lands to be transferred to Mr. Brown exactly the same

---

[5] We note, contrary to the district court's findings, that the United States' decision to disclaim any interest in non-Animas gravel has no bearing on our analysis. The scope of the claim now made by the United States does not affect or alter our interpretation of the 1948 patent.

21

minerals that Mr. Brown could not convey to the United States on behalf of the Tribe."

Aplt. App. at 319. The district court adopted this argument in full, concluding that "[t]ransferring to Mr. Brown the right to mine sand and gravel on the 440-acre parcel, which right he did not have on the 640-acre parcel, would be inconsistent with the parties' intent and with the 'equal exchange' requirement mandated by law." Id. at 322.

This argument was rejected in Hess I:

[W]e reject the government's unsupported argument that gravel must somehow be a "mineral" under the exchange patent because an "exchange of equal value," must mean the reservation interests exchanged in 1948 were equal or identical. In other words, the government contends the mineral interest Mr. Brown held under the Stock-Grazing Homestead Act in his original homestead must be identical to the mineral interest exchanged under the Indian Reorganization Act.

194 F.3d at 1172 n.7. "The law of the case 'doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" Huffman v. Saul Holdings Ltd. P'ship, 262 F.3d 1128, 1132 (10th Cir. 2001) (quoting Arizona v. California, 460 U.S. 605, 618 (1983)). "The doctrine has particular relevance following a remand order issued by an appellate court." Id. "[W]hen a case is appealed and remanded, the decision of the appellate court establishes the law of the case and ordinarily will be followed by both the trial court on remand and the appellate court in any subsequent appeal." Rohrbaugh v. Celotex Corp., 53 F.3d 1181, 1183 (10th Cir. 1995). As the "equal exchange" argument was rejected in Hess I, the district court erred in relying on it.

22

As further evidence that the parties did not intend to include gravel within the general mineral reservation, the Hess family cites a 1956 Department of Interior Solicitor's opinion. The opinion was provided in reference to a general mineral reservation held by the Northern Cheyenne Tribe under the Indian Reorganization Act.

> It is, therefore, my opinion that deposits of sand and gravel in lands allotted or patented under the act which can be shown as of the date of allotment or patent to have a definite economic value by reason of the existence and nearness of a market in which they can be sold at a profit are reserved to the Tribe under the mineral reservation. . . .
> The further principle applied to mineral reservations in grants of private lands that materials constituting all or nearly all the surface of the lands granted will not be considered as being within the reservation (Farrell v. Sayre, Colo. 1954, 270 P.2d 190 . . . ), is applicable with equal force to the lands allotted under the act for the reason that Congress must be presumed to have intended that allotments and patents granted thereunder would in fact be effective to transfer valuable surface rights to the allottees and patentees for agricultural and other useful purposes. However, the effectiveness of the act for these purposes would be negated if sand and gravel constituting all or nearly all the surface were held to be included in the mineral reservation.

Solicitor's Opinion M-36379 (Oct. 3, 1956), Aplt. App. at 788. The Hess family contends this opinion entitles them to summary judgment because at the time of the land exchange, the Animas gravel at issue now *did not have* "a definite economic value by reason of existence and nearness to market." Aplt. Br. at 27. The Hess family also points to the Solicitor's reliance on Farrell and the principle that a mineral reservation does not include materials "constituting all or nearly all the surface" of the lands granted. They argue the evidence in the present case shows that the gravel did constitute the surface. The district court refused to rely on the Solicitor's opinion because it was decided "eight years after

23

the land exchange" and therefore "[i]t cannot serve as a binding policy on the BIA as of the time the BIA decisions regarding this land exchange were being made." Aplt. App. at 329-30.

Agency opinions, because they are not the product of the rigors of formal rulemaking, are not entitled to any deference. Seneca-Cayuga Tribe of Okla. v. Nat'l Indian Gaming Comm'n, 327 F.3d 1019, 1042-1043 (10th Cir. 2003). They are, however, "entitled to respect," Id. at 1042 (citing Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944)), and are entitled to the weight their power to persuade compels. Id. at 1043. Although we do not believe the Solicitor's opinion definitively evinces the government's intent at the time the deed exchange occurred, it does show that the government eight years later recognized the general principles enunciated in Farrell. As such, although the district court did not err in not relying on it, the opinion is persuasive and favors the Hesses on the ultimate issue.[6]

### III.

In sum, we conclude the Hess family has met its burden under 25 U.S.C. § 194.

---

[6] The Hess family also argues the district court erred in not relying on the BIA certification that the mineral reservation on the Brown homestead "will not adversely affect the administration, use or value of the land." Aplt. App. at 434. In short, the family claims this certification is evidence that the parties did not intend to include gravel within the reservation because mining the gravel would, in fact, "adversely affect the . . . use or value of the land." Id. This argument is not persuasive. The BIA certification did not apply to the Hess property and therefore is not evidence of the parties' intent regarding the property in dispute.

Under Colorado law, the general rule is that gravel is not treated as a mineral within a general mineral reservation when gravel underlies a majority of the surface of the property. Here, the Hess family presented evidence that their property is almost entirely underlain with gravel and that mining this gravel will disrupt use of the surface. Further, the Hess family presented evidence of the parties' intent that persuasively suggested gravel was not included within the reservation. The strongest evidence of the parties' intent is the government's own appraisal of the property and the evidence that the gravel had no economic value in 1948.

We **REVERSE** and **REMAND** to the district court with instructions to enter judgment for the defendants.